Robert L. TWYMAN, Plaintiff-Appellant,

v.

Richard A. CRISP, Phillip Kirk, Melvin D. Typer, James E. Sorrells, and Charles E. Stamper et al., Defendants-Appellees.

No. 77–1921.

United States Court of Appeals, Tenth Circuit.

Sept. 6, 1978.

Robert L. Twyman filed a pro se memorandum opposing summary affirmance.

Larry Derryberry, Atty. Gen., Ross N. Lillard, III, Asst. Atty. Gen., filed a memorandum brief in support of summary affirmance on behalf of appellees.

Before LEWIS, BARRETT and LOGAN, Circuit Judges.

PER CURIAM.

Appellant Robert L. Twyman is an Oklahoma State prisoner presently serving a life sentence in McAlester, Oklahoma. He has instituted the captioned case pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343, 2201, and 2202, seeking various forms of declara-

tory and injunctive relief as well as money damages against prison officials for violations of his civil rights. The district court boiled down the numerous issues in the complaint to five:

1. The upgrading of appellant from minimum to maximum security custody with the subsequent placing of him in the maximum security cellhouse without a prior hearing violated the due process requirements of *Wolff v. McDonnell,* 418 U.S. 539 [94 S.Ct. 2963, 41 L.Ed.2d 935] (1974).

2. Appellant was denied medical care.

3. The defendants denied appellant access to the courts by restricting appellant's use of the law library and by restricting the number of free letters appellant was permitted to mail.

4. Appellant was subjected to cruel and unusual punishment when defendant Tyler forced him to stand handcuffed in a hallway for five hours.

5. Appellee Crisp has formulated unconstitutional policies and practices which are supported and carried out by the other named defendants.

Two of these issues, the reclassification issue and the unconstitutional policies issue, were decided prior to the trial by way of the partial granting of defendants' motion for summary judgment. Trial was then had on the claimed inadequate medical care, the standing handcuffed for five hours claim, and the adequacy of the law library, coupled with the free stamp question. On consideration of all the evidence, the district court dismissed the action.

In his memorandum brief Twyman claims the following trial court errors were made:

1. The district court erred in denying appellant's motion to file a supplemental complaint and in not sanctioning the defendants for untimely and uncooperative compliance with discovery rulings.

2. The district court erred in granting summary judgment with respect to the claimed denial of due process on the reclassification question.

3. The district court erred in interpreting the facts surrounding the summary

removal of appellant from medium security to maximum security without a prior hearing.

4. The district court erred in finding that appellant was not denied adequate access to the law library and that the law library was neither inadequate in size nor incompetently staffed.

5. The district court failed to correctly apply *Bounds v. Smith,* 430 U.S. 817 [97 S.Ct. 1491, 52 L.Ed.2d 72] (1977) as requiring the state to provide free postage and envelopes for legal mail.

6. The district court erred in failing to find that appellant was denied medical care based on the alleged cancellation of a special bland diet.

7. The district court erred in various rulings on motions and in failing to inform appellant of the scope of the scheduled trial.

On appeal, it appears that Twyman has dropped his challenge to the constitutionality of the warden's policies, as well as the claim regarding having been required to stand handcuffed for five hours as constituting cruel and unusual punishment. We also note that allegations numbered one and seven above are essentially discretionary trial court procedural matters and do not constitute substantive claims.

Thus, it appears that the following claims that have survived for review by this court on appeal:

1. Denial of adequate medical care.

2. Denial of due process in the reclassification from medium to maximum security without compliance with *Wolff v. McDonnell, supra.*

3. Inadequate access to the law library through time restrictions and denial of access to the courts through enforcement of the stamp policy.

## I. *Denial of Adequate Medical Care*

Twyman contends that because of ulcers he is required to eat small amounts of food five or six times a day and that he needs a bland diet. He further claims that in January of 1976 the diet was cancelled at the direction of appellee Tyler, resulting in ap-

pellant's having frequent spells of vomiting. At trial Twyman admitted that despite cancellation of the diet, he succeeded in obtaining the bland food he claims he needed. He was able to do this (because of his connections with personnel in the kitchen) from January of 1976 through March of 1976, when he was placed in the maximum security cellhouse. In January of 1977, Twyman was put on a diet of between-meal sandwiches, and in April of 1977 the bland diet was restored. During the time between March 1976 and January 1977, appellant received vitamin pills.

On cross-examination, Twyman stated that he spent two years on a regular diet before obtaining the bland diet and that all he (Twyman) knew of the alleged cancellation order was what one Dr. Kim had told him. Twyman admitted he had made no attempt to contact appellee Tyler to verify the alleged cancellation, to request an exception, or to seek any other relief.

Appellee Tyler denied having cancelled appellant's diet and stated that appellant had never notified him (Tyler) of any diet cancellation. Dr. Karl Sauer, Chief Medical Officer at the penitentiary, testified that appellant's medical records reflected that the first time a bland diet was ever prescribed for Twyman was in April of 1977, and that he (Sauer) was unaware of any incidents of interference by appellee Tyler with medical diagnoses or inmate treatment.

Warden Crisp testified that the alleged diet cancellation could possibly have stemmed from a misunderstanding by two Philippine doctors that bland diets were only to be prescribed for medical (as opposed to religious) reasons. Crisp also testified that only Dr. Sauer could determine and decide a medically required diet.

█ Based on the above, appellant has failed to carry the burden of proving that the alleged diet cancellation constituted cruel and unusual punishment in violation of *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). It is true that a properly pleaded claim of interference by

prison officials with prescribed medical treatment is cognizable under § 1983. *See Tolbert v. Eyman,* 434 F.2d 625 (9th Cir. 1970). However, in order to state a claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *West v. Keve,* 571 F.2d 158 (3rd Cir. 1978). The facts produced at trial through the testimony of appellant, appellee Tyler, and the prison doctor belie the existence of the requisite *deliberation* and *gravity* (emphasis added). *Dickson v. Colman,* 569 F.2d 1310 (5th Cir. 1978). Nor has Twyman established deliberate defiance of a medical order, despite his allegations. *See Martinez v. Mancusi,* 443 F.2d 921 (2nd Cir. 1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971). There is adequate evidence of sick calls, examinations, diagnoses, and medication. *Smart v. Villar,* 547 F.2d 112 (10th Cir. 1976). Finally, Twyman has not established that appellee Tyler directly participated in the alleged contravention of medical orders. *Bennett v. Passic,* 545 F.2d 1260 (10th Cir. 1976). Thus the alleged denial of medical care claim is without merit.

## II. *Denial of Procedural Due Process*

The facts appear relatively undisputed that in March of 1976 Twyman was summarily reclassified from medium to maximum custody and transferred to the east cellhouse, with considerable restrictions on his movement and other privileges. The reasons given for the reclassification were that appellant was engaging in "disruptive · activities." Appellees admit the reclassification procedure is used in lieu of a formal disciplinary proceeding, apparently on the ground that this "administrative" proceeding does not result in the denial or loss of good time. Appellees further state that they proceed in this manner for reasons of institutional security; in Twyman's case he was suspected of being connected with a prison fire. Appellant claims that the reclassification scheme is a subterfuge to avoid the requirements of *Wolff v. McDonnell, supra,* and that the system violates the requirements enunciated in *Battle v. Anderson,* 376 F.Supp. 402, 431 (E.D.Okl.1974).

There does not appear to be any loss of statutory good time, principally because Twyman is not entitled to such time since he is serving a life sentence. However, he does contend that he has lost many privileges and that he cannot earn "statutory work good time credits." Twyman further contends that prisoners in maximum custody were only provided two hours per week in the prison law library.

Inasmuch as statutory good time is not involved, the analysis is not so much Twyman's other lost privileges or even the reclassification methods used by prison officials, but whether any right has been created by state law or prison regulation for a prisoner at McAlester to remain in the general population absent specific infractions of the prison rules. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

The Supreme Court in *Meachum v. Fano, supra,* held that the due process clause does not protect a prisoner from being transferred from one institution to another within a state prison system. The Court at pages 226–227 of 427 U.S., at page 2539 of 96 S.Ct. distinguished *Wolff v. McDonnell, supra,* because the liberty interests in *Wolff* had its roots in state law:

> Here, Massachusetts law conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct. Insofar as we are advised, transfers between Massachusetts prisons are not conditioned upon the occurrence of specified events. On the contrary, transfer in a wide variety of circumstances is vested in prison officials.

The Court continued at page 228, 96 S.Ct. at page 2540:

> That an inmate's conduct, in general or in specific instances, may often be a major factor in the decision of prison officials to transfer him is to be expected unless it be assumed that transfers are mindless events. . . . .

A prisoner's behavior may precipitate a transfer; and absent such behavior, perhaps transfer would not take place at all. . . . Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all.

In *Montanye v. Haymes, supra*, 427 U.S. at p. 242, 96 S.Ct. at p. 2547, the Court elaborated on its holding that due process does not require a transfer hearing, whether or not the transfer is a result of the inmate's misbehavior or may be labeled as discretionary or punitive:

As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.

Losses such as a job, friendships, and the like simply are not protected interests. *Meachum v. Fano, supra*, 427 U.S. p. 235, n. 8, 96 S.Ct. 2532.

Recently the Supreme Court has reaffirmed *Meachum, supra*, although in a somewhat different context:

It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual. If new conditions of confinement are not materially different from those affecting other prisoners, a transfer for the duration of a prisoner's sentence might be completely unobjectionable and well within the authority of the prison administrator." (Citation omitted.) *Hutto v. Finney,* —— U.S. ——, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

Other federal courts have followed *Meachum, supra*, concluding that where there are no state laws or prison regulations creating either a right or an expectation for a prisoner to remain in a particular prison or classification to which he was assigned, no due process hearing is required in conjunction with the transfer. *See Russell v. Oliver*, 552 F.2d 115, 116–117 (4th Cir. 1977); *Four Certain Unnamed Inmates v. Hall*, 550 F.2d 1291 (1st Cir. 1977); *Cale v. Paderick*, 546 F.2d 577 (4th Cir. 1976); *Franklin v. Fortner*, 541 F.2d 494 (5th Cir. 1976); *Bruce v. Wade*, 537 F.2d 850 (5th Cir. 1976); *Lavine v. Wright*, 423 F.Supp. 357 (D.Utah, 1976); *Hodges v. Klein*, 421 F.Supp. 1224 (D.N.J.1976); *Brooks v. Wainwright*, 439 F.Supp. 1335 (M.D.Fla.1977).

By Oklahoma statute the Director of Corrections is vested with broad discretionary powers to manage the prison system. Specifically, he is empowered to transfer prisoners from one institution to another, 57 O.S. § 510(9) (1976 Supp.), and to prescribe rules for the conduct and management of each institution, including rules for the demeanor of prisoners and the punishment of recalcitrant prisoners. 57 O.S. § 510(8) (1976 Supp.). These provisions of the statute have remained essentially unchanged since the 1967 Corrections Act (formerly 57 O.S. § 510(i)), which the Oklahoma Court of Criminal Appeals held vested total discretion in the director with respect to prisoner transfers. *Gettings v. Page*, 442 P.2d 534 (Okl.Cr.1968).

Appellant does not claim that any statute or prison regulation confers upon him any right or expectation of remaining in the general prison population absent specific rule violations. The only Oklahoma statutes with respect to work credit for prisoners states that prisoners who work will receive certain specified work credits. 57 O.S. § 138 (1976 Supp.). The statute nowhere provides entitlement to, or expectation of, a prisoner's obtaining or keeping a job.

The particular reclassification system at McAlester has been upheld by the district court on previous occasions. Specifically the court has held that loss of the *opportunity* to earn good time credit (as a trusty) because of reclassification does not deprive a prisoner of a constitutional right. *Dolph*

*v. Crisp*, 446 F.Supp. 1179 (E.D.Okl.1978); see also, *Gardner v. Benton*, 452 F.Supp. 170 (E.D.Okl.1977), wherein Judge Morris held that reclassification and subsequent in-prison transfer is valid because the Oklahoma statute does not guarantee that an inmate will receive work time credit, nor does it promise that a prisoner will be provided an opportunity to work:

> It simply provides that if he does work he will receive work-time credits. At an institution with a large inmate population there are jobs for only a limited number of prisoners. Therefore, it cannot be said Oklahoma law creates any right to work-time credits which amounts to a liberty or property interest.

There, as here, no claim is made that any previously earned credit of any kind has been forfeited. In addition this court has held that forfeiture of pay and denial of certain privileges attendant to being in the general prison population do not state a constitutional deprivation under § 1983. *Gregory v. Wyse*, 512 F.2d 378 (10th Cir. 1975); *Johnson v. McCune*, Unpublished No. 76–1037 (10th Cir. October 8, 1976).

We therefore conclude that Twyman's transfer to maximum custody and to the east cellhouse is completely within the sphere of authority of prison officials and that appellant has no legitimate claim of entitlement to remain in the general prison population. See *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Marchesani v. McCune*, 531 F.2d 459 (10th Cir. 1976).

## III. *Denial of access to the Law Library and to the Courts*

Appellant's final claim is that he has been denied adequate access to the law library and to the courts. When this action was filed in the district court in July of 1976, prison policy restricted the use of the library for those prisoners in maximum custody to two hours per week. At that time, only four inmates could use the facility at any one time. In October of 1976 the law library was moved to larger quarters. However, until May of 1977 the two-hour restriction was still in effect, with exceptions made for prisoners facing court deadlines. Twyman was occasionally denied access so other prisoners could use the library. Since May of 1977 the library has been able to accommodate ten inmates at one time, and prisoners in both the east and west cellhouses are now permitted access eight hours per day, two days per week. Prisoners are permitted to keep legal materials in their cells and to work there as well.

Appellant concedes that he has legal materials in his own cell and is able to cite applicable legal authority in his various documents. Indeed, a quick perusal of his 38-page response to appellees' motion for summary judgment indicates he is quite capable of drafting a thoroughly legible, articulate, and authoritative pleading. If appellant could show that he has somehow been prejudiced in any of his various lawsuits, he might perhaps have a legitimate claim.

However, Twyman does not allege that any of his multitudinous filings have been stricken as untimely or that any of his cases have been dismissed or otherwise prejudiced. He claims he has had to file for extensions of time, but certainly this condition is not uncommon to real lawyers. In addition, restricted access to the law library is not per se denial of access to the courts. *United States v. Evans*, 542 F.2d 805 (10th Cir. 1976). Nor do either *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) or *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) equate access to the courts with the adequacy of a prison law library. The prison library is but one factor in the totality of all factors bearing on the inmates' access to the courts which should be considered. *Hampton v. Schauer*, 361 F.Supp. 641 (D.Colo.1973).

In *Jordon v. Johnson*, 381 F.Supp. 600 (E.D.Mich.1974), *affirmed*, 513 F.2d 631 (6th Cir.), *cert. denied*, 423 U.S. 851, 96 S.Ct. 96, 46 L.Ed.2d 75 (1975), the inmates of the Southern Michigan Prison challenged the law library regulations limiting use of the library to one hour per day (with provisions

for requesting additional time). During the pendency of the lawsuit the regulations were changed to increase the library time to an average of 11½ hours per week. The court held, relying in part on *Hampton v. Schauer, supra,* that the additional hours provided made access to the library sufficient to protect the federally insured right of access to the courts. It has also been held that prison regulations which reasonably limit the times, places, and manner in which inmates may engage in legal research and preparation of legal papers do not transgress the constitutionally protected rights so long as the regulations do not frustrate access to the courts. *Gittlemacker v. Prasse,* 428 F.2d 1 (3rd Cir. 1970); see also *Frazier v. Ward,* 426 F.Supp. 1354 (N.D.N.Y.1977) (no denial of access to the courts by prisoners in the control unit [segregation] who were not allowed to go to the prison law library but were permitted to check out two books every other night to be picked up the following morning).

█ Although two hours per week may seem a short period of time in which to accomplish any meaningful legal research, the record in this case demonstrates that Twyman has not been denied access to the courts because of restrictions on *his* amount of time in the library. Since the rules have now been changed to provide considerably more time, this claim is without merit. *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) is not to the contrary. In *Bounds,* part of the approved library plan consisted of one full day perhaps only every several weeks when accompanied by other available types of assistance. *Bounds v. Smith, supra,* pp. 819, 831, 97 S.Ct. 1491.

█ Ancillary to the library access claim are charges that the typewriters are inadequate and that the inmate law clerks have occasionally refused to type appellant's pleadings. Even if true, these contentions are without legal merit. Access to the courts does not include a federally protected right to use a typewriter or to have one's pleadings typed, *Stubblefield v. Henderson,* 475 F.2d 26 (5th Cir. 1973), the reason being

that pro se prisoners causes are not prejudiced by the filing of handwritten briefs. *Tarlton v. Henderson,* 467 F.2d 200 (5th Cir. 1972). *See also Hampton v. Schauer, supra,* p. 644.

Finally appellant challenges the present policy with respect to the mailing of legal material, i. e., the stamp policy. Pursuant to this policy, which became effective April 20, 1977, an inmate must have less than $5.00 in his inmate account to qualify for free postage. He then receives postage for a maximum of two letters per week (eight per month), legal or otherwise. Only if a prisoner has zero in his trust fund will stamps for legal mail (no other type) be provided in excess of the eight. Inmates are also not permitted to receive stamps through the mail from outsiders and are obligated to purchase all their envelopes for both legal and non-legal mail.

█ Appellant contends that his indigency has been established by the grant of leave to proceed in forma pauperis by the district court. As further evidence of the alleged unreasonableness of the stamp policy at McAlester, Twyman states that civil rights complaints may be filed without paying the $15.00 district court filing fee if his prison account is less than $75.00, in accordance with the Uniform Forms for Filing Civil Rights Complaints. We note, however, that the $75.00 threshold is simply a mandatory amount *above which* a litigant must pay the $15.00 filing fee. The rule does not state that no one with less than $75.00 will not be required to pay. This is discretionary with the district court.

Appellant also points to the language in *Bounds v. Smith, supra,* 430 U.S. at pp. 824–825, 97 S.Ct. at p. 1496:

> Moreover, our decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts. It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, *and with stamps to mail them.* (emphasis added).

■ Twyman therefore concludes that he is entitled not only to unrestricted access to the courts but to completely free access as well. Certainly, if *Bounds* is to be read literally, the decision would appear to support his claim. However, other case law does not. Prisoners do not have an unlimited right to free postage in connection with the right of access to the courts. *Bach v. Coughlin,* 508 F.2d 303 (7th Cir. 1974). Reasonable regulations are necessary to balance the rights of prisoners with budgetary considerations. *Bach v. Coughlin, supra,* pp. 307–308. *See also O'Bryan v. County of Saginaw, Michigan,* 437 F.Supp. 582 (E.D. Mich.1977) (similar rules prescribed two free letters per week for indigent inmates with inability to pay based on an average two week balance of $2.00); *Coleman v. Crisp,* 444 F.Supp. 31 (W.D.Okl.1977) (upholding denial of unlimited free postage at McAlester).

Whether *Bounds v. Smith, supra,* is to be interpreted as requiring the states to shoulder the burden of providing unlimited free legal correspondence is best left to the Supreme Court. In the instant case, Twyman has not demonstrated denial of *his* right of access to the courts. Even if some of his legal letters were returned for failure to qualify for free mailing privileges under the present prison policy, Twyman has not had a case dismissed or any other court sanctions imposed simply because he has had to wait for awhile to mail something. Appellant would have us declare that state prisons are required to supply unlimited free postage for legal mail or as an alternative determine whether the $5.00 "indigency" level is constitutional permissible. We need not determine these issues at this time.

We are not unaware that some courts have required a minimum of free postage for prisoners. *Brenneman v. Madigan,* 343 F.Supp. 128 (N.D.Cal.1972) (postage for five letters per week for pre-trial detainees required); *Jones v. Wittenberg,* 330 F.Supp. 707 (N.D.Ohio, 1971), *affirmed sub nom., Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972), order on compliance, 440 F.Supp. 60 (N.D.Ohio, 1977) (prison officials to provide postage for maximum of five letters per week to indigent inmates); *Williams v. Ward,* 404 F.Supp. 170 (S.D.N.Y.) (four free stamps per month are provided); *Morgan v. LaVallee,* 526 F.2d 221 (2nd Cir. 1975) (prisoner had stated § 1983 claim against prison officials for requiring him to inform correspondents not to send postage stamps, where prison officials provided only one stamp per week).

Other courts have held to the contrary. *Coleman v. Crisp, supra,* (no right to unlimited free postage to mail letters to a judge); *Bach v. Coughlin, supra; Craig v. Hocker,* 405 F.Supp. 656 (D.Nev.1975) (state under no obligation to provide means of communication with the courts, i. e., stamps). *Cf. O'Bryan v. County of Saginaw, Michigan, supra.*

In the lower court opinion in *Smith v. Bounds,* 538 F.2d 541, 543, n.1 (4th Cir. 1975), the order approving the library plan submitted by the state reads in part as follows:

'Inmates will have access to a Xerox machine for copying opinions, statutes, etc. This will be on a cost basis to those inmates who are able to pay. Those who are not will be permitted to use the library free. In regard to the posting of inmate petitions to the courts, postage will be paid by the inmates themselves if they are able to do so; if not, by the Department of Corrections.'

■ We do not interpret either this language or the Supreme Court's reminder in *Bounds v. Smith, supra,* 430 U.S. pp. 824–825, 97 S.Ct. 1491 as specifically requiring states to pay the postage on every item of legal mail each and every prisoner wishes to send. The stamp policy presently in effect at McAlester, although not necessarily deserving of our approval, does not appear to have denied *this* appellant any constitutional right. Some delays in access to the courts are inevitable. To require a prisoner who wishes to prosecute several legal actions simultaneously to have to choose occasionally between stamps and coffee is certainly no more a restriction than that which any indigent pro se non-prisoner must face.

When this case was docketed the parties were notified the appeal would be decided on the original record without oral argument. The parties were advised pursuant to Local Rule 9(d) that they could simultaneously file a memoranda in support of their respective positions. Both parties have done so. Having thoroughly reviewed the files and records in this case, we are convinced the decision of the district court was correct.

AFFIRMED.