Gary KNOP, John Ford, William Lovett, II, Ramando Valeroso, Gus Jansson, Pat Sommerville, Vernard Cohen, T. Jon Spyima, Robert Shipp, Butch Davis, Ron Mixon, and Kerwin Cook, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

Perry M. JOHNSON, Robert Brown, Jr., Dale Foltz, John Jabe, Theodore Koehler, John Prelesnik, and Jack Bergman, Defendants.

No. G84–651.

United States District Court,
W.D. Michigan, S.D.

Feb. 27, 1987.

Elizabeth Alexander, Adjoa Aiyetoro, Nkechi Taifa-Caldwell, Nat. Prison Project, Washington, D.C., Patricia Streeter, Detroit, Mich., for plaintiffs.

Thomas Nelson, Brian McKenzie, David Edick, Atty. General's Office, Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This case presently is before the Court for decision on defendants' motions for involuntary dismissal, filed pursuant to Rule 41(b) of the Federal Rules of Civil Procedure ("FRCP"); defendants' February 24, 1986 motion for partial summary judgment on the legal mail issue; and plaintiffs' July 1, 1986 motion to reconsider denial of motions to strike witnesses and to impose sanctions upon defendants. The Court listened to plaintiffs' evidence in this case in August and October of 1986. In December of 1986 defendants filed six motions for involuntary dismissal of plaintiffs' claims. The Court accepted rather extensive memoranda on defendants' motions for the following reasons: (1) it thought that there might be some merit to such motions; and (2) given the amount of evidence plaintiffs have introduced, I thought that I might benefit from the parties' discussions of such evidence and applications of the applicable legal standards to it. The parties' submissions certainly have assisted the Court in assimilating plaintiffs' evidence and gaining a better understanding of the legal and factual issues I need to decide either now or at the conclusion of the entire proceeding. The break in the trial between October, 1986 and its resumption on March 16, 1987, moreover, has enabled me to review significant portions of the extensive record.

As I will discuss in this opinion, defendants have for the most part failed to convince me that I should grant their motions for involuntary dismissal, and I thus will decline to rule on defendants' request for entry of a judgment in their favor until all of the evidence the parties wish to present is before me. In this opinion I will first discuss the standard I must employ in deciding defendants' rule 41(b) motions. I then will discuss defendants' specific motions. Finally, I will consider plaintiffs' motion to reconsider. The Court realizes that this opinion is rather short given the amount of evidence in the record and the length of the memoranda the parties have submitted on defendants' motions. The opinion's length, however, does not in this instance accurately reflect the amount of time the Court has devoted to reading and analyzing the parties' submissions and to reviewing the evidence in the file. It reflects, rather, that I need not enter extensive findings of fact and conclusions of law unless I decide to grant defendants' motions, and my unwillingness to engage in an extensive discussion of the evidence at this time when I will have to do so at the conclusion of the trial. The following discussion is intended primarily to assist the parties in focusing their presentations in the remainder of this case. In general, the Court believes that plaintiffs have put forth substantial and meritorious claims for relief and feels that both sides would benefit from some discussion, however slight, of those claims at this time.

### Rule 41(b) Standard

Rule 41(b) provides as follows:

For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for

dismissal of an action or of any claim against him. After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

FRCP 41(b). As the language of the rule indicates, in considering a rule 41(b) motion the Court must evaluate the evidence and is entitled to determine the credibility of plaintiffs' witnesses. *See Bach v. Friden Calculating Machine Co.*, 148 F.2d 407, 410 (6th Cir.1945); *see generally* 5 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 41.13[4] (2d ed. 1986). Plaintiffs are not necessarily entitled to prevail on defendants' motions, moreover, simply because they may have established a prima facie case; the Court, rather, must determine whether they have established their entitlement to relief by a preponderance of the evidence. *See Sutton v. Atlantic Richfield Co.*, 646 F.2d 407, 411 (9th Cir. 1981); *Ash v. Hobart Manufacturing Co.*, 483 F.2d 289, 291–92 (6th Cir.1973); *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 154–55 (8th Cir.1977). The Court possesses substantial discretion in deciding whether to enter judgment at this time or to withhold making a decision on the merits until the conclusion of defendants' presentation, however, and I note that the Courts of Appeals for the Fifth Circuit and the Ninth Circuit have cautioned district courts about "the inconvenience that results from a promiscuous use of Rule 41(b) dismissals." *Riegel Fiber Corp. v. Anderson Gin Co.*, 512 F.2d 784, 793 n. 19 (5th Cir. 1975); *see also SEC v. Murphy*, 626 F.2d 633, 659 (9th Cir.1980) ("a trial court should be reluctant to grant the motion except in clear cases because an appellate reversal for error in granting the motion may require an entire new trial"). It also is inefficient, however, to continue to try issues that are not in dispute or that are not material to the ultimate disposition of this case. As I indicated previously, therefore, I will attempt, given the brevity of the opinion, to give as much guidance to the parties as possible.

### Motion for Involuntary Dismissal Regarding MIPC

■ Defendants' first motion for involuntary dismissal concerns the effect of their decision to convert the Michigan Intensive Programming Center ("MIPC") into a protective custody unit for the Marquette Branch Prison. As a result of this decision, MIPC is now designated as A–Block of the MBP. Defendants argue that because of this change, the Court should dismiss all claims against MIPC. The Court agrees with plaintiffs that this motion is utterly without merit. As I will discuss in connection with defendants' other motions, plaintiffs have presented substantial evidence that unconstitutional conditions of confinement exist at A–Block. A mere change in name certainly does not result in the elimination of those conditions. *See Liles v. Ward*, 424 F.Supp. 675 (S.D.N.Y. 1976). A change in that institution's function may alleviate those conditions in whole or in part. Proof of that, however, will be part of defendants' burden when they present their side of the case, and the Court sees no basis for entering a judgment at this time in defendants' favor regarding plaintiffs' claims against A–Block.

### Motion for Involuntary Dismissal Regarding Winter Clothing

■ Defendants' second motion concerns plaintiffs' claim that inmates are not pro-

vided adequate winter clothing. First Amended Complaint ("FAC") ¶ 47. Defendants argue that plaintiffs' evidence demonstrates that inmates are provided adequate winter clothing. Defendants also argue that in any event, plaintiffs have failed to establish a constitutional violation, particularly given that they cannot aggregate conditions of confinement to create a "totality of conditions" that may be unconstitutional. *See Walker v. Mintzes*, 771 F.2d 920, 925 (6th Cir.1985). Plaintiffs respond that they have produced sufficient evidence to establish both that inmates are not provided adequate winter clothing and that this situation is unconstitutional. The Court finds that defendants are not entitled to judgment at this time for the following reasons.

First, plaintiffs may establish a constitutional violation by showing that they are being deprived "of 'life's necessities.'" *Id., quoting Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Adequate clothing is one of life's necessities to which inmates are entitled. *Walker*, 771 F.2d at 926, *quoting Hoptowit v. Ray*, 682 F.2d 1237, 1246–47 (9th Cir.1982); *see also Bellamy v. Bradley*, 729 F.2d 416, 419 (6th Cir.1984) (listing clothing as one of the basic necessities of life); *Toussaint v. McCarthy*, 597 F.Supp. 1388, 1410 (N.D.Ca.1984) ("Clothing is a basic area of Eighth Amendment concern"), *aff'd in part, rev'd in part, vacated in part, & remanded*, 801 F.2d 1080 (9th Cir.1986); *Balla v. Idaho State Board of Corrections*, 595 F.Supp. 1558, 1575 (D.Idaho 1984) (finding the clothing there to be "patently insufficient to protect [the] inmates from the cold in the winter months"). Plaintiffs do not allege that the clothing defendants provide them is "garish, illfitting, degrading and humiliating to wear." *Wolfish v. Levi*, 573 F.2d 118, 132 (2d Cir.1978), *rev'd and remanded on other grounds sub nom., Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). They argue, rather, that defendants simply have failed to provide them with clothing that is suitable for Michigan winter weather. The Court agrees that plaintiffs have established a basis for finding that defendants do not provide them with adequate winter clothing.

Plaintiffs have submitted credible evidence indicating that not all inmates are provided with adequate winter clothing. *See, e.g.,* Transcript ("T") at 1961–63 (Hines); 2022–23 & 2026 (Griffen); 1336–37 & 1343–44 (Kingon); & 1379 (Conley-Bey). Defendants do appear to provide inmates with clothing that is adequate for moderate to warm temperatures, *see* T at 1842 (Cochran), and to provide adequate winter clothing for inmates who work outside for extended periods of time. *See* T at 1539–40 (Braska). Defendants appear, moreover, to be manufacturing a warmer kind of winter jacket. *See* T at 1967–68 & 2013–14 (Hines). This new coat, however, is being distributed only to selected institutions, T at 1968–69 (Hines), and as I stated previously not all inmates are adequately supplied with winter clothing. Finally, plaintiffs have produced credible evidence that defendants' failure to have supplied all inmates with adequate winter clothing has caused them to suffer some pain. *See, e.g.,* T at 1966 (Hines); 2023 (Griffin); 2582 (Shelly); & 2506–07 (Phillips). Plaintiffs certainly have not produced compelling testimony regarding the pain they suffer from lack of winter clothing. Given defendants' failure to have demonstrated any penological justification for failing to provide plaintiffs with adequate winter clothing, however, the evidence plaintiffs have produced is sufficient to defeat defendants' motion for an involuntary dismissal. *See Walker*, 771 F.2d at 925 ("'Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification"'") (quoting *Chapman*, 452 U.S. at 346, 101 S.Ct. at 2399).

For the above reasons, the Court will decline to enter judgment for defendants on the winter clothing issue, at least at this time.

*Motion for Involuntary Dismissal Regarding Legal Mail*

■ Defendants' third rule 41(b) motion concerns their regulations governing plaintiffs' receipt of legal mail from, among

other persons, attorneys and the courts. The parties disagree about the system defendants should employ to secure plaintiffs' right to confidential communications with their attorneys and the courts while concurrently protecting defendants' legitimate security interests. *See Wolff v. McDonnell,* 418 U.S. 539, 574–77, 94 S.Ct. 2963, 2983–85, 41 L.Ed.2d 935 (1974). Defendants filed a motion for partial summary judgment on this issue on February 24, 1986. In an oral opinion rendered on June 2, 1986 the Court stated that it was confused as to the nature of the parties' disagreements, and on June 6th it ordered the parties to submit supplemental briefs on the issue. The Court was unable to rule on defendants' motion prior to trial, and plaintiffs apparently thus decided to present evidence on the legal mail issue. I now find that I should deny defendants' motion for summary judgment and also their rule 41(b) motion on the legal mail issue, in part because the Court is unclear as to how defendants' system for treating legal mail as privileged actually operates and therefore does not believe that it has an adequate factual basis for making a final determination of whether that system is constitutional. In the remaining portion of the trial, the parties should focus on clarifying how the system operates at the various institutions.

Defendants' system for treating legal mail as privileged, meaning that plaintiffs have the right to be present when it is opened and inspected for contraband, is contained in two administrative rules and a policy directive. Administrative Rule 791.-6603(4) provides that "[p]ursuant to a specific written request by a resident, mail which is clearly identified as coming from the resident's designated attorney or the corrections ombudsman shall be opened and inspected for contraband in the resident's presence." This rule clearly places the burden on the inmate to invoke his right to be present when mail coming from his attorney, whom he must designate in advance, or the corrections ombudsman is inspected for contraband. Administrative Rule 791.6615(2) provides, however, that in addition to mail from an inmate's designat-

ed attorney or the corrections ombudsman, mail from courts, public officials, the director of the department of corrections, and the corrections commission shall also be treated as confidential, and thus presumably opened only in the inmate's presence if he so requests. Finally, Policy Directive PD–BCF–63.03 provides in pertinent part that "[u]pon written request by a prisoner to the institution's mail room supervisor, mail which is clearly designated as being from the prisoner's designated attorney, the courts, or from the Legislative Corrections Ombudsman, shall be opened and inspected for contraband in the prisoner's presence." Like Administrative Rule 791.6603(4), this policy directive places the burden on the inmate to invoke his right to be present when confidential communications are inspected for contraband. It goes beyond that administrative rule, however, to require that the inmate's request be directed to the mail room supervisor and to encompass mail from the courts as well as mail from the inmate's designated attorney and from the corrections ombudsman.

It is apparent from the plain language of these standards that there are some conflicts between them. Plaintiffs have introduced testimony, moreover, indicating that the different institutions tend to interpret and to apply them differently. At the SPSM and the MBP, once an inmate has written to the mailroom and indicated that he has an attorney, the mailroom makes a notation that any mail the inmate receives that is clearly marked as coming from an attorney (not necessarily a designated attorney), a court, or the corrections ombudsman is to be treated as privileged mail, and the inmate is entitled to be present when the mail is inspected for contraband. T at 530 (Wilbur). At the MR, however, the mailroom will not treat mail as being privileged unless it comes from the inmate's specifically designated attorney. T at 530–31 (Wilbur). Mail from an attorney other than the one whom the inmate has designated apparently will not be treated as privileged, and thus will be inspected for

contraband outside of the inmate's presence.

As the Court understands plaintiffs' case, they essentially raise two objections to defendants' system for treating legal mail as privileged. First, they object to defendants' decision to require the inmates to take some affirmative step to invoke their right to be present when their legal mail is inspected for contraband. Plaintiffs argue that defendants' system facilitates unknowing waivers of the right to be present when legal mail is inspected for contraband, noting in particular that inmates tend to be confused as to how they should invoke this right. They urge the Court to require defendants to implement a system whereby rather than being required affirmatively to invoke their right to be present when their legal mail is inspected, inmates are automatically guaranteed this right and are given the option to "opt-out" of the system and choose not to be present when their legal mail is inspected. T at 593–94 (Wilbur); see Memorandum in Opposition to Defendants' Motion for Summary Judgment Regarding Privileged Mail Policy at 4.

Second, and relatedly, defendants' system, at least as it is being implemented at the MR, results in a situation where an inmate who does not know the identity of his attorney has no means of invoking his right to be present when mail from that attorney is inspected for contraband. This situation could arise in at least two contexts. First, whenever an inmate is appointed an attorney in a case, there is a chance that the initial communication from that attorney to the inmate will be inspected for contraband outside of the inmate's presence because the inmate will have been unable to notify the mailroom of that attorney's existence and identity. Second, in a class-action context, where one attorney or one set of attorneys are representing a number of inmates, the inmates similarly may be unable to invoke their right to be present when mail from such attorney(s) is inspected for contraband. In either of these two contexts, an inmate could be deprived of his right to be present when his legal mail is inspected for contraband. See

Taylor v. Strerrett, 532 F.2d 462, 475 (5th Cir.1976). I think that this possibility and evidence suggesting that requiring inmates to invoke their right to be present when their legal mail is inspected has caused some inmates unintentionally to waive that right require the Court to deny defendants' motion for summary judgment on this issue.

My review of defendants' rule 41(b) motion, plaintiffs' response, and the evidence plaintiffs have introduced at trial leads me to conclude, moreover, that I also should not enter judgment in defendants' favor on this issue at this time. I do not believe that plaintiffs have presented a particularly persuasive case on the legal mail issue. For the following four reasons, however, I will decline to decide that issue at this time. First, at least with regard to how it is being implemented at the Michigan Reformatory, defendants' policy on its face may result in situations where an inmate has no effective means for invoking his right to be present when his legal mail, i.e., mail from his attorney, the courts, or the corrections ombudsman, is opened and inspected for contraband. Defendants will bear the burden during their phase of the trial of attempting to alleviate the Court's concern in this regard. Second, plaintiffs have presented some evidence suggesting that defendants' privileged mail policy is confusing to the inmates and results in situations where the inmates unintentionally waive their privileged mail rights. See, e.g., Ex. 155; Ex. 169; T at 3131–34 (Purchis); T at 593–94 (Wilbur). This evidence is not strong, but it is in the record and there is no contrary evidence suggesting that inmates generally understand defendants' privileged mail policy and are able to invoke their privileged mail rights. Third, the Court does not believe that there is any evidence in the record as to why defendants have decided to adopt an "opt-in" as opposed to an "opt-out" policy. I believe that defendants indicated in their motion for summary judgment on this issue that they adopted this policy because inmates complained about constantly having to go to the mailroom to have their legal mail

inspected in their presence and an "opt-in" policy is administratively more efficient. Defendants have not introduced evidentiary support for these reasons, however, and in addition have not explained why an opt-in as opposed to an opt-out policy better resolves these two problems. Finally, as I indicated previously I still am not clear on how defendants' system operates at the various institutions and would like to listen to some more evidence on that issue.

For the above reasons, the Court will decline to grant defendants' motion for involuntary dismissal of the legal mail issue.

### Motion for Involuntary Dismissal Regarding Lack of Lavatory Facilities at RCF

Defendants' next motion for involuntary dismissal concerns plaintiffs' claim that many inmates confined at the Riverside Correctional Facility are subjected to cruel and unusual punishment because they are "confined overnight in cells that do not contain a toilet or wash basin" and are "required to perform bodily functions in a plastic bottle which remains" in their cell until the morning. FAC ¶ 42. As defendants note in their motion, plaintiffs raise this claim on behalf of five separate groups of inmates: (1) those general population inmates who are confined in cells without toilets; (2) the reception and guidance center admittees who are sent to seven building, first floor; (3) the protective custody inmates who are confined in seven building, third floor; (4) the administrative segregation inmates who also are confined in seven building, third floor; and (5) the inmates who are placed in eleven building, east wing, for mental health treatment. Defendants argue that the uncontested evidence establishes that all of these inmates are confined in clean cells, are allowed out on a regular basis to use the common lavatory facilities, have not suffered any health problems associated with the lack of toilets and sinks in their cells, suffer at most from occasional lapses in defendants' system of releasing inmates from their cells to use the bathroom, and are confined in cells that conform to American Correctional Association ("ACA") standards. In addition, defendants argue that the uncontested evidence shows that the general population inmates are locked in their cells only for count and thus have virtually unlimited access to the bathroom facilities. In response, plaintiffs argue that inmates confined in cells at the RCF that do not have toilets or sinks are subjected to a serious risk of harm in that they are often given used urinals, are not given proper supplies for cleaning their urinals, have their requests for bathroom release ignored, are often forced to defecate in their cells, and are often forced to dispose of their urine and feces by dumping it into the courtyard. They also argue that defendants' actions subject inmates to psychological and physical pain. Finally, plaintiffs observe that mental health inmates who are confined in eleven building also are subject to additional inflictions of psychological and physical pain because of defendants' bathroom policy.

The Court believes that plaintiffs' case is the strongest on this issue. Plaintiffs presented compelling testimony on the following points:

—Inmates often are given used urinals that not only are dirty and smelly but obviously present a risk to their health. *E.g.* T at 1058–59 (Roberts); 1075–76 (Mrozsk); & 1733 (Scott).

—Inmates often are not allowed out to use the bathroom when they need to do so. *E.g.* T at 1704–05 (Harp); 1886 (Chipman).

—Inmates occasionally are forced to defecate in their cells. *E.g.* T at 1887 (Chipman); 1430–31 (Redson); Ex. 29 at 29 (Waterman Dep.).

—Several inmates are forced to eat in their cells despite having no washbasin or toilet. *E.g.* T at 1094–95 (Wysocki); 1075 (Mrozsk).

—Inmates often are unable to secure proper cleaning supplies for their urinals. *E.g.* T at 1734–35 (Scott); 1054–55 (Roberts).

—Inmates have suffered psychological pain from having to defecate or urinate in

their cells. *E.g.* T at 1095 (Wysocki); 1060 (Roberts); 1041–42 (Lashuay).

The Court discussed the legal basis for plaintiffs' claim in its June 2nd oral opinion in which it denied defendants' motion for summary judgment on this issue. I will not repeat that discussion here, but rather will simply address defendants' contention that plaintiffs' claims do not satisfy the eighth amendment standards the Supreme Court established in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In *Rhodes* the Supreme Court clarified that the eighth amendment prohibits conditions of confinement that "involve the wanton and unnecessary infliction of pain" and are "grossly disproportionate to the severity of the crime warranting imprisonment." *Id.* at 347, 101 S.Ct. at 2399. In examining whether conditions of confinement violate the eighth amendment, a court must examine their effect on the inmates. If such conditions result "in unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities", then they may be found to be unconstitutional. *Id.; see also id.* at 367, 101 S.Ct. at 2410 (Brennan, J., concurring in the judgment) ("A court is under the obligation to examine the *actual effect* of challenged conditions upon the well-being of the prisoners") (emphasis in original); *Walker*, 771 F.2d at 925 (noting that under *Rhodes* prison conditions may be unconstitutional if they deprive prisoners of " 'essential food, medical care or sanitation' ") (*quoting Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400). The Court also notes in regard to the *Rhodes* standard that the Supreme Court observed that among " 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification' ". *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399 (citations omitted).

In this case, plaintiffs' evidence shows that certain inmates confined at the RCF are both being deprived of basic sanitation requirements and being forced to endure inflictions of psychological and physical pain, and to suffer significant risks to their physical well-being, absent any established penological justification for such treatment. I am not at this time going to review all of the pertinent case law in this area. I believe it is sufficient for purposes of deciding the present motion for me to observe that I believe that many inmates who are confined at the RCF in cells without toilets or washbasins are being deprived of their constitutional rights under the eighth amendment, as the Supreme Court has interpreted those rights in *Rhodes* and other cases. Defendants correctly argue that in the abstract, it may not constitute cruel and unusual punishment for prison administrators to confine inmates in cells without sinks, toilets, and hot and cold running water. Administrators may be able adequately to compensate for such physical plant deficiencies with release policies that allow inmates regular access to bathroom facilities. As the Supreme Court indicated in *Rhodes*, however, a court cannot look at prison conditions in the abstract. That was the error the district court committed in *Rhodes*. In this case, plaintiffs have established that defendants' bathroom release policy and other means of compensating for the RCF's physical plant deficiencies do not operate effectively. Defendants now bear the burden of establishing that the situation is not as bad as it presently appears to be to the Court.

For the above-stated reasons, the Court will deny defendants' motion for involuntary dismissal on this issue, for the most part. I will grant defendants' motion insofar as it concerns the general population inmates who are confined at the RCF. The Court's understanding of plaintiffs' evidence is that the general population inmates are confined in their cells only at count-time, and are otherwise free to use the common bathroom facilities. *See* T at 790 (Court noted that "the evidence in the case shows that the general group is never locked in its cell"). I do not, moreover, believe that any of plaintiffs' testimony concerning the receipt of dirty urinals, defecation and urination in cells, or the dumping of feces and urine into the courtyard involves general population inmates.

*Motion for Involuntary Dismissal
Concerning Access to Courts*

■ Defendants' next motion concerns plaintiffs' claim that defendants have failed to guarantee inmates their constitutional right of "adequate, effective, and meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 822, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977). Plaintiffs argue in essence that defendants maintain an insufficient number of law books to service the inmate population; that defendants' collection is deficient in some critical areas; that inmates, particularly those who are confined in segregation units, are not allowed adequate access to the law libraries; that defendants fail to provide legal assistance to those inmates who are unable to use the libraries effectively; and that inmates have suffered harm from defendants' failure to have provided them with effective access to legal resources. Defendants respond, and argue in their motion for involuntary dismissal, that they maintain an adequate collection of law books at all of the subject institutions; that inmates are in general provided an adequate opportunity to use the law libraries, and that plaintiffs have at best established a few isolated incidents where some inmates may have been denied access; that inmates who are unskilled in legal research and analysis can seek assistance from jailhouse lawyers, professional librarians, inmate law clerks, and, at least at the SPSM, Prison Legal Services; and that in any event, plaintiffs have not established that inmates have suffered harm from any defects that may exist in defendants' system of access to the courts. The Court will divide its discussion of this motion into two parts. First, I will briefly review the law on this issue that I discussed in my June 2nd opinion on defendants' motion for summary judgment. Second, I will briefly discuss my general understanding of plaintiffs' evidence. As with defendants' other motions, the Court finds that it is unable to enter a judgment in defendants' favor, at least at this time. I further believe that along with the lack of toilets issue, this issue presents plaintiffs' strongest chance of succeeding on the merits of their claims.

The Court gave a rather lengthy discussion of the access to courts issue in its June 2, 1986 oral opinion on defendants' motion for summary judgment. Transcript of June 2, 1986 at 34–46. I will not repeat that entire discussion here. I think that it is important, however, for me to reiterate a couple of key parts of that opinion. First, I note again that the parties do not appear to disagree that the governing standard the Court must apply in deciding plaintiffs' legal access claim is whether defendants provide inmates "adequate, effective, and meaningful" access to the courts. *Bounds,* 430 U.S. at 822, 97 S.Ct. at 1495; *see also Patterson v. Mintzes,* 717 F.2d 284, 288 (6th Cir.1983) ("Prison officials are charged with the responsibility of assuring that inmate access to the courts is 'adequate, effective and meaningful' ") (citation omitted). Second, the Court determined in its June 2nd opinion that it must apply two criteria in determining whether defendants have satisfied this standard. First, I must consider whether some source of professional legal information, whether in the form of an adequately stocked law library, attorneys, or some combination of the two, is available to all inmates. Second, I must consider whether "for those inmates who possess insufficient intellectual or educational abilities to permit reasonable comprehension of their legal claims", defendants make some provision for "them to communicate with someone who, after consultation with the legal learning source, is capable of translating their complaints into an understandable presentation." *Kendrick v. Bland,* 586 F.Supp. 1536, 1549 (W.D.Ky.1984); *see Glover v. Johnson,* 478 F.Supp. 1075, 1096 (E.D.Mich.1979). As I noted in my June 2nd opinion, I believe that this formulation of defendants' obligation is consistent with the position most courts have taken on this issue, although the case law admittedly is not always clear and the parties are free of course to attempt to persuade me otherwise.

Given this understanding of the applicable case law, I believe that plaintiffs have established their entitlement to relief by a preponderance of the evidence, absent any

rebuttal from defendants. I base this conclusion on the following factual determinations, noting as I discuss plaintiffs' case that the following discussion is tentative and is not to be construed by the parties in any way as my final decision on these issues:

—Although defendants maintain extensive collections of law books at certain institutions, in particular the SPSM, their collections at other institutions appear to be inadequate. Plaintiffs presented a significant amount of evidence, for example, indicating that the collection at the Marquette Branch Prison simply is not adequate to service the inmate population. *See, e.g.*, Exs. 61 & 62. Inmates confined at the Trusty Division at Marquette, moreover, often are forced to use what defendants refer to as an "unofficial" law library, but is in actuality little more than a miscellaneous collection of mostly out-of-date books. *See* T at 1670–72. Finally, plaintiffs' evidence strongly suggests that the collections defendants maintain in the so-called "mini-law libraries" are pathetic, to say the least. The Court fails to understand how defendants can expect an inmate confined in a segregation unit to be able to perform adequate legal research in such a library. Given that legal research, as the attorneys well know, often entails extensive cross-checking and running down dead-end leads, an inmate who is forced to perform his legal research in such a library and to rely on a "kite" system for acquiring books from the main law library is at a serious disadvantage. *See Toussaint v. McCarthy*, 801 F.2d 1080, 1109–10 (9th Cir.1986).

—Inmates occasionally are denied access to the law library system. This access problem has two components. The first component concerns the adequacy of defendants' collection of law books. As I indicated previously, the Court heard a significant amount of testimony indicating that inmates often are unable to find the books they need when they are allowed to use the law libraries. This problem is particularly significant for inmates, such as those confined in segregation units or in minimum security units, who must rely on the kite system to secure books from the main libraries or who must transfer to a different institution in order to gain physical access to a main law library. I will not resolve at this time the parties' dispute over the significance of exhibits documenting the percentage of requested books that are actually delivered to the inmates. *Compare Defendant's Brief* at 14 *with Plaintiffs' Brief* at 6–7. I believe it is sufficient for now for me to note that defendants have failed to convince that I need not accept any more evidence on this issue.

The second component is that defendants occasionally deny physical access to the law libraries to inmates who are entitled to such access. The Court does not believe that this is a significant problem for general population inmates. The primary problems with these inmates appear to be that they occasionally are denied more than six hours per week of access, and that they occasionally are arbitrarily denied access, such as when a librarian or a guard denies them access apparently for no valid reason. The problem is more serious for segregation inmates, who apparently often have difficulty in gaining access even to the mini-law libraries or are required to use such libraries at bizarre times.

—The legal assistance defendants provide to inmates who use the law libraries and need such assistance often is poor. The inmate law clerk system appears to be the strongest part of defendants' legal assistance mechanism. Even this system, however, has its weak points. The Court accepted credible evidence, for example, that inmate law clerks are forbidden to offer legal assistance to other inmates and often are punished for doing so. Plaintiffs' evidence indicates, moreover, that defendants' claim that they employ professional librarians at all of the law libraries is at best misleading. Simply put, the Court believes that defendants bear a heavy burden in demonstrating that the law librarians are competent and able to perform their duties fairly and impartially, and that each institution employs a professional librarian on a consistent basis. Finally, the Court has heard no significant evidence

suggesting that "jailhouse lawyers" are able to assist inmates effectively. Plaintiffs' evidence suggests, rather, that defendants, for good reasons, attempt to maintain fairly tight control over jailhouse lawyer contracts, and that the jailhouse lawyers who are able to assist other inmates are not necessarily equal to the task at hand.

—Finally, the Court heard credible evidence that the alleged deficiencies in defendants' system of legal access have caused many inmates to suffer harm. Mr. Braska testified, for example, that he had a complaint dismissed because he was unable to perform the research he needed in order to respond to a "rebuttal." T at 1541–43. Mr. Kemp-Bey testified as to the frustration he experienced in attempting to respond to a Magistrate's Report and Recommendation. T at 1610–17. Mr. Cade similarly testified to his inability to conduct necessary research to respond to a motion to dismiss. T at 2463–64. Finally, Mr. Kingon also testified as to his inability to secure the cases he needed to respond to a motion for summary disposition. T at 1329–30. The Court recognizes that *pro se* pleadings are judged under a lesser standard than pleadings that are drafted by an attorney. The advantage a *pro se* petitioner enjoys, however, is limited, and a party who is able to conduct legal research on the pertinent issues is much better off. I believe, moreover, that the kinds of harm inmates in the plaintiff class have suffered constitute a denial of access to the courts under *Walker. See Walker*, 771 F.2d at 932 (indicating that an inmate may be able to establish a constitutional deficiency by showing that " 'he has somehow been prejudiced in any of his ... lawsuits' ") (*quoting Twyman v. Crisp*, 584 F.2d 352, 357 (10th Cir.1978)). The Sixth Circuit held in *Walker* that inmates enjoy no constitutional right to a specified amount of law library time. A court, rather, must measure the adequacy of defendants' system of legal access by the inmates' ability to gain access to the courts through that system. In this case, plaintiffs have established a credible claim that they are not able to gain

adequate, effective, and meaningful access to the courts through defendants' system.

For the above reasons, the Court will decline to grant defendants' motion for involuntary dismissal of this claim. I reiterate that although this opinion in no way binds me from ruling otherwise at the conclusion of the trial, I believe that plaintiffs have presented a substantial claim that defendants have denied them their constitutional right of access to the courts. Plaintiffs may not succeed on this claim at the end of trial, but at the present time the evidence preponderates in their favor.

### Motion for Involuntary Dismissal of Racial Discrimination Claim

■ The last and most difficult rule 41(b) motion the Court must resolve concerns plaintiffs' claims that black inmates are discriminated against on the basis of their race. The parties have filed detailed and, for the most part, well-written memoranda on defendants' motion. In these memoranda, the parties dispute vigorously the facts in the record, the inferences and conclusions the Court should draw from those facts, and the legal standards the Court should apply in deciding plaintiffs' claims. The Court has read the parties' memoranda with great care and has reviewed selected portions of the record. I believe that given the amount and somewhat ambiguous nature of the evidence plaintiffs have introduced on this issue, the fact-intensive nature of the legal determinations the Court is required to make, and the importance our society places on treating people, including prison inmates, fairly and impartially and not on the basis of their race and color, it would be judicially inefficient and unwise for me to attempt to resolve plaintiffs' racial discrimination claims at this time. This is an issue that requires a considered and thoughtful analysis based on all of the relevant evidence that the parties wish to introduce. I thus will "decline to render any judgment until the close of all the evidence" on this issue. FRCP 41(b). To assist the parties, however, I offer the following tentative discussion of the facts.

Plaintiffs' claims basically fall into four areas. The first area concerns the use of racial slurs. The Court heard a significant amount of testimony on the use of racial slurs by guards and other staff at the subject institutions. Any use of racial slurs is, of course, a serious matter. To some extent, however, I heard less testimony on the use of racial slurs than I may have expected, particularly at institutions such as the MBP and the MIPC (A–Block) where the custodial staff is overwhelmingly white and the inmate population is predominately black. It is my impression, moreover, that a significant number of the slurs that are made come from a relatively small number of defendants' staff. Finally, the Court does not believe that plaintiffs have established an overwhelmingly persuasive basis for me to hold the named defendants liable for whatever racial slurs are made. There is evidence in the record suggesting that the named defendants are aware of incidences of racial slurs and have failed to take effective action to stop them. As with plaintiffs' other claims of racial discrimination, however, the question of supervisory liability will be a difficult one for the Court to resolve.

The second area concerns segregated dining halls. The Court has two comments to make on this area. First, it believes that plaintiffs have established by a preponderance of the evidence, absent any rebuttal by the defendants, that segregation does occur in the dining areas. Second, I am not sure that I can hold defendants liable for this segregation. In my June 2nd opinion I stated that "inmate self-selection is not necessarily a defense to liability," citing *Jones v. Diamond,* 636 F.2d 1364, 1373 (5th Cir.1981) (*en banc*). T at 49. I did not suggest, however, that inmate self-selection could never be a defense to liability. *See Bazemore v. Friday,* —— U.S. ——, ——, 106 S.Ct. 3000, 3012–13, 92 L.Ed.2d 315, 335–36 (1986) (holding that the "mere continued existence of single race clubs does not make out a constitutional violation" where "one's choice of a club is entirely voluntary").

The third area concerns job placement. The Court has three comments to make on

this area. First, I will consider whether defendants' Policy Directive PD–DWA–64.-01 is unconstitutional, either facially or as implemented by defendants. I believe that plaintiffs have fairly placed this policy directive in issue both by their pleadings and by their evidence, and defendants are on notice that they should address it in their presentation. Second, the Court heard evidence suggesting that apart from the effect of this policy directive, racial discrimination does occur in the job assignment process. Finally, there remains the issue of supervisory liability. As plaintiffs note, supervisory liability would be clear if the Court were to find the policy directive racially discriminatory. In other aspects of job discrimination, however, defendants' liability is not so clear.

The final area concerns plaintiffs' allegations that black inmates are disproportionately assigned to administrative segregation and punitive detention and that white inmates are disproportionately given protective custody status. I have three comments to make on this area. First, my ultimate resolution of plaintiffs' claims will depend substantially on my view of plaintiffs' statistics. Defendants have launched a cogent attack on those statistics, and the Court is not sure how much reliance it can place on them. Second, the Court agrees with plaintiffs that it can consider their claim of discriminatory assignment to administrative segregation. Plaintiffs filed a memorandum on this issue on July 1, 1986. The Court believes that plaintiffs adequately raised their claim of discriminatory placement in administrative segregation in their first amended complaint, during discovery, and at trial. Defendants thus are on notice that they should be prepared to rebut such claim. Third, defendants rely heavily in their attack on plaintiffs' claims on suggestions that reasons other than racially discriminatory motives explain any disproportionate placements in punitive detention, administrative segregation, and protective custody that occur. They should be prepared to discuss and to introduce evidence on those other reasons when the trial resumes.

In summary, defendants have failed to convince the Court that it should dismiss plaintiffs' claims of racial discrimination, and I believe that such claims are too important to be resolved in ruling on a rule 41(b) motion. I thus will decline to enter judgment at this time on those claims.

### Plaintiffs' Motion to Reconsider

Plaintiffs' motion concerns issues the Court was forced to resolve on the first day of trial. Plaintiffs request the Court to reconsider in part the decisions it made on June 2nd and to impose the following sanctions on defendants for discovery and pre-trial abuses: (1) strike Camille Camp as a witness; (2) strike Andrew Jackson as a witness; and (3) require defendants to reimburse plaintiffs for the costs they incurred in deposing Lawrence Stiffman, James Luckey, Paul Wuford, and Janet Pratt. The Court has considered plaintiffs' motion, defendants' response, and plaintiffs' reply. Without rehashing old arguments, the Court will resolve plaintiffs' motion to reconsider as follows:

First, I will reinstate my order striking Andrew Jackson as a witness. T at 92. I simply cannot allow defendants to get away with circumventing Magistrate Rowland's decision to strike this witness.

Second, with regard to Camille Camp, I am going to grant plaintiffs' motion to reconsider in part and to order defendants to pay the costs, including reasonable attorneys' fees, plaintiffs incurred in deposing Ms. Camp.

Third, the Court will deny plaintiffs' motion to reconsider in all other respects.

### Conclusion

As the Court stated at the beginning of this opinion, it realizes that the opinion is fairly brief given the extensive record in this case and the detailed memoranda the parties filed on defendants' motions. I have concluded, however, that it would not be proper for me to render judgment at this time, and thus will decline to do so until the close of all the evidence. I hope, however, that the opinion will assist the parties in the second part of this trial. I also expect that by now the parties have a more accurate assessment of the strengths and weaknesses of their respective positions. In that regard the Court will order counsel for the parties to meet, in person, sometime before the resumption of the trial to discuss settlement of any or all of the issues presently before the Court.

### ORDER

In accordance with the opinion dated February 27, 1987;

IT IS HEREBY ORDERED that defendants' motion for involuntary dismissal of plaintiffs' claims involving the Michigan Intensive Programming Center is DENIED; the Court will decline to render any judgment on such claims until the close of all the evidence;

IT IS FURTHER ORDERED that defendants' motion for involuntary dismissal of plaintiffs' claim of inadequate winter clothing is DENIED; the Court will decline to render any judgment on such claim until the close of all the evidence;

IT IS FURTHER ORDERED that defendants' motion for involuntary dismissal of plaintiffs' lack of access to toilets claim is DENIED in part and GRANTED in part; except with respect to the general population inmates, for whom defendants' motion is GRANTED, the Court will decline to render any judgment on such claim until the close of all the evidence;

IT IS FURTHER ORDERED that defendants' motion for involuntary dismissal of plaintiffs' legal mail claim is DENIED; the Court will decline to render any judgment on such claim until the close of all the evidence;

IT IS FURTHER ORDERED that defendants' February 24, 1986 motion for partial summary judgment on the issue of defendants' legal mail policy is DENIED;

IT IS FURTHER ORDERED that defendants' motion for involuntary dismissal of plaintiffs' access to courts claim is DENIED; the Court will decline to render any judgment on such claim until the close of all the evidence;

IT IS FURTHER ORDERED that defendants' motion for involuntary dismissal of plaintiffs' racial discrimination claims is DENIED; the Court will decline to render any judgment on such claims until the close of all the evidence;

IT IS FURTHER ORDERED that plaintiffs' July 1, 1986 motion to reconsider denial of motions to strike witnesses and to impose sanctions upon defendants is GRANTED in part and DENIED in part;

IT IS FURTHER ORDERED that counsel for the parties shall meet, in person, at least five (5) days before the resumption of trial to discuss settlement of any or all of the issues presently before the Court.