61 F.3d 915
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Robert E. COTNER, Plaintiff-Appellant,
v.
Vincent KNIGHT; R. Michael Cody; Larry A. Fields; Helen
Moss; David Walters; Susan Brimer Loving,
Defendants-Appellees.
 No. 95-6105.
 United States Court of Appeals, Tenth Circuit.
 July 21, 1995.
 
 Before ANDERSON, BALDOCK and BRORBY, Circuit Judges.
 ORDER AND JUDGMENT*
 BRORBY, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 Mr. Cotner, a state inmate and pro se litigant, appeals the adverse grant of summary judgment. We exercise jurisdiction under 28 U.S.C. Sec. 1291 and affirm the judgment of the district court.
 
 
 3
 Mr. Cotner filed a civil rights suit under Sec. 1983 against the warden, the attorney for the Department of Corrections and other prison officials. The allegations of the complaint are lengthy, rambling, vague, and conclusory, but the gravamen of the complaint appears to be that Mr. Cotner wished to prevent retaliation against him for exercising his rights to access the courts and for his helping of other prisoners with their legal work. The suit requested "DECLA[RA]TORY judgment of ALL issues raised in the index" and "Temporary injunction TO PREVENT transfer of petitioner to a higher security prison OR to one of same medium security that would restrict any access to programs or law library that would be less than what he now enjoys."
 
 
 4
 Defendants filed a motion for summary judgment with supporting evidentiary material. Mr. Cotner proceeded to file hundreds of pages of motions, objections and assorted pleadings. The matter was referred to a Magistrate Judge who issued a thirty page Report discussing and analyzing all of the issues. The Report concluded by recommending the district court grant Defendants' motion for summary judgment. Mr. Cotner filed voluminous objections to this report and the district court granted Defendants' motion for summary judgment and denied the request for a temporary restraining order.
 
 
 5
 Mr. Cotner appeals from this judgment asserting, inter alia, "Defendants - continue - to - threaten - AND carry - out - their MANY - threats" and he raises numerous other complaints against prison officials which were not raised before the district court. This court will not consider issues that have not been raised before the trial court. See, e.g., In re Walker, 959 F.2d 894, 896 (10th Cir. 1992).
 
 
 6
 Mr. Cotner has failed to persuade this court of any error in the Report recommending granting summary judgment with respect to the claims raised before the district court. We attach hereto a copy of the Magistrate Judge's Report and Recommendation as filed in the District court on February 13, 1995. We AFFIRM the judgment of the district court for substantially the same reasons set forth by the Magistrate Judge in his accurate and thorough Report.
 
 
 7
 The mandate shall issue forthwith.
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT FOR THE
 WESTERN DISTRICT OF OKLAHOMA
 ROBERT COTNER, Plaintiff
 
 8
 vs.
 
 
 9
 VINCENT KNIGHT, et al., Defendants CIV-94-848-T
 
 REPORT AND RECOMMENDATION
 
 10
 ARGO, United States Magistrate Judge.
 
 
 11
 Plaintiff, a state prisoner appearing pro se and in forma pauperis, brings this action alleging certain violations of his constitutionally protected rights and seeking a declaratory judgment with regard to those rights. The court-ordered special report has been filed pursuant to Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978), and on September 15, 1994, the Defendants filed a motion to dismiss/motion for summary judgment. Plaintiff has responded to the motion and thus it is at issue. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. Sec.636(b)(1)(B), and for the reasons stated herein, it is recommended that the motion be granted.
 
 
 12
 The Court's responsibility to liberally construe Plaintiff's pro se pleadings has been made extremely difficult due to the fact that he appears to raise certain causes of action in his form complaint and then attempts to add other issues in his "affidavit" and brief attached to the complaint. Additionally, he has filed numerous motions in which he complains about various matters, many of which were not raised in the initial complaint or amended complaint and Plaintiff has not sought leave of Court to amend the complaint to add those issues. Too, the Court's job has been made more difficult by Plaintiff phrasing his allegations in general terms without a supporting factual basis and without showing whether the claimed wrongs occurred to him, to other prisoners or if he simply believes that the wrongs may occur in the future. Lastly, interpreting Plaintiff's pleadings has been made difficult as he has changed his theme as his lawsuit progressed. Initially, Plaintiff very clearly filed this action under 42 U.S.C. Sec.1983 claiming a violation of his constitutional rights as well as seeking a declaratory judgment as to certain issues. When the Defendants responded with certain defenses to the Sec.1983 action, Plaintiff claimed that the Defendants falsely characterized his complaint as an action under 42 U.S.C. Sec.1983, when in fact it is only a declaratory judgment action. See pleading filed September 23, 1994 [Docket No. 59]. Despite these difficulties, the undersigned has attempted to ascertain all of the issues about which the Plaintiff complains and to examine those issues under the applicable law. The issues raised by the Plaintiff as gleaned by the undersigned are as follows:
 
 
 13
 1) the Oklahoma Department of Corrections (DOC) is required to pay all costs of a prisoner's habeas corpus action under 22 Okla. Stat. Sec.1277(c);
 
 
 14
 2) the Defendants have restricted his mailing privileges;
 
 
 15
 3) the Defendants have restricted his freedom of speech and freedom of religion rights;
 
 
 16
 4) there have been multiple violations of the orders entered in Battle v. Anderson, Case No. 72-95 (E.D. Okla.);
 
 
 17
 5) the Defendants have a history of threatening retaliatory action against persons for exercising their rights of access to the court, including threatening the prisoner with transfer to another prison facility;
 
 
 18
 6) the conditions of confinement to which he is subjected violate his Eighth Amendment right;
 
 
 19
 7) he is being denied access to the courts as the size of the prison law library has been reduced as well as the amount of time to which he has access to it; and
 
 
 20
 8) he is entitled to have his life sentences treated as a 45-year sentence with appropriate credits applied thereto, thus reducing it even more and thus allowing him a new parole consideration date.[1]
 
 
 21
 In presenting this matter, Plaintiff argues that he has an absolute right to maintain a declaratory judgment action on these issues. However, he seriously misinterprets or misunderstands his rights under the declaratory judgment statute. That statute is simply an enabling act which confers discretion on courts to declare rights, but it does not impose a duty on the Court to do so or empower a litigant with an absolute right. Public Service Commission of Utah v. Wycoff Co., 344 U.S. 237 (1952); Twin City Federal Sav. and Loan Ass'n. v. Gelhar, 525 F.Supp. 802 (D. Minn. 1981), aff'd, 681 F.2d 528 (8th Cir. 1982). The decision whether to exercise jurisdiction in a declaratory judgment action is within the sound discretion of the trial court. Aetna Cas. and Sur. Co. v. Jefferson Trust and Sav. Bank of Peoria, 993 F.2d 1364 (8th Cir. 1993). A declaratory procedure is used to remove uncertainty from legal relations and clarify and stabilize them before irreversible actions have been taken. In other words, the purpose is to have courts render declaratory judgments to guide the parties in their dealings with each other, thus relieving them from the risk of taking undirected action which could jeopardize their position or cause serious difficulties. Declaratory judgment is used to expeditiously resolve issues on which a complexity of rights may depend. Delaney v. Carter Oil Co., 174 F.2d 314 (10th Cir. 1949), cert. denied, 338 U.S. 824 (1949). It appears that the Plaintiff is simply seeking legal advice on whether the Defendants have violated his constitutional rights and this of course is not a proper function of a declaratory judgment action. Courts do not give advisory opinions even under the guise of declaratory judgment. Like any other action, "actual controversy" is a jurisdictional prerequisite to a declaratory judgment action. Miller v. Udall, 368 F.2d 548 (10th Cir. 1966); Grafon Corp. v. Hausermann, 602 F.2d 781 (7th Cir. 1979). Thus, to the extent that the Plaintiff seeks declaratory judgment, it is recommended that the Court exercise its discretion and refuse to entertain that action.
 
 
 22
 To the extent that the Plaintiff intends to pursue an action under 42 U.S.C. Sec.1983 for alleged violations of his constitutional rights, the Defendants seek summary judgment. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court views the evidence and the inferences to be drawn therefrom in the light most favorable to the non-moving party. Manders v. State of Oklahoma ex rel. Department of Mental Health, 875 F.2d 263, 264 (10th Cir. 1989), citing Barber v. General Electric Company, 648 F.2d 1272, 1276 n. 1 (10th Cir. 1981). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are "facts that might affect the outcome of the suit under the governing law." Id. Factual disputes that are irrelevant or unnecessary will not be counted. Id. Furthermore, a Martinez report is treated as an affidavit, as is the Plaintiff's complaint if it alleges facts based upon the Plaintiff's personal knowledge and has been sworn under penalty of perjury. Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991). In addition, "a movant is not always required to come forward with affidavits or other evidence to obtain summary judgment; once the movant points out an absence of proof on an essential element of the non-movant's case, the burden shifts to the non-movant to provide evidence to the contrary." Id. at 1111, n.5, citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
 
 I. COSTS OF HABEAS CORPUS ACTION
 
 23
 Plaintiff first contends that pursuant to 22 Okla. Stat. Sec.1277(c), the DOC is required to pay all costs of a prisoner's habeas corpus action. This issue raises no right protected by the Constitution or laws of the United States and presents no justiciable case or controversy as Plaintiff makes no claim that he has even attempted to invoke the provisions of this statute. Moreover, a clear reading of that statute shows that Plaintiff's claim is completely frivolous. The statute appears designed to help alleviate the undue financial burden placed on the budgets of state district courts that have a prison facility located within their boundaries by prisoners filing habeas corpus actions in forma pauperis. Accordingly, provision is made for the DOC to reimburse the courts for their costs of those habeas corpus actions. However, that statute specifically allows the court and the court clerk to collect costs from the inmate in those cases where the inmate has the financial resources to pay.
 
 
 24
 II. MAIL RESTRICTIONS/FIRST AMENDMENT CLAIMS
 
 
 25
 Plaintiff next contends that the Defendants have restricted his mailing privileges. In conclusory terms, he alleges that his mail has been lost, delayed, destroyed and returned to the sender without notice to him. He also complains that restrictions have been placed on his mailing privileges and that he has been denied a publication entitled "White Aryan Resistance" that he needs to do "legal research."
 
 
 26
 In addressing Plaintiff's claim, it must be kept in mind that while convicted prisoners do not forfeit all of their constitutional protections by reason of their conviction and confinement in prison, incarceration by its very nature brings with it the withdrawal and limitations of certain rights afforded other citizens. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987), citing Bell v. Wolfish, 441 U.S. 520, 545 (1979). However, in order to justify the withdrawal or limitation of constitutional rights, such withdrawal or limitation must be related to valid penological objectives such as deterrence of crime, rehabilitation of prisoners and promotion of institutional order and security. O'Lone v. Estate of Shabazz, 482 U.S. at 348, 350. With these considerations in mind, it is noted that prisoners retain the right to send and receive mail, see Thornburgh v. Abbott, 490 U.S. 401 (1989), and repeated violations of a prison mail policy may implicate First Amendment concerns if the prison employee acts in an "arbitrary" or "capricious" fashion. Lavado v. Keohane, 992 F.2d 601, 609-610 (6th Cir. 1993). "Conversely, prison officials have a duty to maintain security within the prison, and this may include reading inmates' incoming and outgoing mail, with the exception of legal mail." Thongvanh v. Thalacker, 17 F.3d 256, 258-59 (8th Cir. 1994). In the interest of prison security, prison officials may open and inspect non-legal mail addressed to an inmate without the presence of the inmate. See Wolff v. McDonnell, 418 U.S. 539, 576-77 (1974) (noting "freedom from censorship is not equivalent to freedom from inspection or perusal" and holding that a rule "whereby the inmate is present when mail from attorneys is inspected [does] all, and perhaps more than the Constitution requires"). Thus, the rights of prisoners to correspond with people outside of the prison must be weighed against the intractable problems of prison safety and security, areas in which prison officials are far better equipped to deal with than the judiciary. Smith v. Maschner, 899 F.2d 940, 944 (10th Cir. 1990).
 
 
 27
 The special report contains a copy of the DOC's policy and regulations on mailing privileges. Relevant provisions of the regulations show that inmates are 1) prohibited from corresponding with others relating to business operations except to the extent necessary to protect their property interests, and then only with the approval of the warden; 2) prohibited from receiving publications that advocate racial hatred; and 3) prohibited from corresponding with other inmates unless it is approved by the warden. See OP-030117, dated July 30, 1994, pp. 1-3, Attachment D to Special Report. Additionally, this regulation provides that for security concerns and to enforce the correspondence guidelines, a prisoner's nonprivileged outgoing and incoming mail may be opened and inspected. Privileged mail, however, can only be searched and read upon reasonable suspicion that unauthorized activities or materials have been placed in the privileged mail and the search is authorized by the warden. Incoming privileged mail may also be opened and inspected when staff suspects that the mail did not come from a privileged correspondent. Privileged correspondents are defined in the regulations while privileged legal correspondents are defined to include the courts and a prisoner's attorney of record or an attorney with whom the prisoner has an attorney/client relationship. Id. Incoming legal mail can only be opened in the presence of the inmate and checked only for contraband.
 
 
 28
 While the Plaintiff does not appear to challenge the DOC regulations on mailing privileges, to the extent that he does, his claim should fail. In addressing challenges to prison regulations, it must be kept in mind that great deference and latitude must be allowed prison officials in managing the day-to-day operations of the prison system due to the unique nature, needs and concerns in the prison atmosphere. The Supreme Court has explained this deferential treatment by noting that
 
 
 29
 [r]unning a prison is an inordinately difficult undertaking that requires expertise, planning and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.
 
 
 30
 Turner v. Safley, 482 U.S. 78, 84-85 (1987). The Eighth Circuit in evaluating a claim that a prison institution's regulation violated an inmate's rights to free exercise of religion also recognized the great respect that the judiciary must necessarily pay to the decisions of prison administrators.
 
 
 31
 Initially we recognize "that issues of prison management are, both by reason of separation of powers and highly practical considerations of judicial competence, peculiarly ill-suited to judicial resolution, and that, accordingly, courts should be loath to substitute their judgment for that of prison officials and administrators."
 
 
 32
 Iron Eyes v. Henry, 907 F.2d 810, 812 (8th Cir. 1990), citing Pitts v. Thornburgh, 866 F.2d 1450, 1453 (D.C. Cir. 1989).
 
 
 33
 Mindful of the prisoner's constitutional rights and the need to balance such against the objectives of the penal system and the great deference to be given the decisions of prison officials, the Supreme Court has held that challenges to a prison regulation are to be judged under a "reasonableness" test and not the higher scrutiny that would normally be afforded an alleged violation of a fundamental right.
 
 
 34
 We recently restated the proper standard: "[W]hen a prison regulation impinges an inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, supra, 482 U.S., at 89, 107 S.Ct., at 2261. This approach ensures the ability of corrections officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," ibid., and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to "resolution by decree." (citation omitted).
 
 
 35
 O'Lone, 482 U.S. at 349-350. In determining whether it is "reasonable," a regulation should be subjected to the four-part test announced in Turner, 482 U.S. at 89-90.
 
 
 36
 1. There must be a valid rational connection between the regulations and the legitimate government interest;
 
 
 37
 2. One must consider whether there are alternative means of exercising the right that remain open to prison inmates;
 
 
 38
 3. One must consider the impact accommodating the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
 
 
 39
 4. The absence of ready alternatives is evidence of the reasonableness of a prison regulation.
 
 
 40
 With these standards in mind, the undersigned finds that the DOC's policy on regulating mail is rationally related to the need to maintain prison security. Prison officials must regulate those items coming into and going out of their prison. Moreover, the prisoner is not completely denied mail rights although his ability to use the mail must be accomplished through the guidelines set forth in the regulation. Further, one prisoner cannot be given a special accommodation without granting the same to all prisoners. IF the mail is not regulated, certain contraband material might be introduced into the prison posing a threat to the guards and/or other prisoners. Additionally, no party has suggested any readily available alternatives to regulation of the mail. Finally, the regulations appear to have been tailored to be as least intrusive as possible. Thus, as the undersigned concludes that the regulations on mailing privileges are valid, the relevant facts concerning Plaintiff's claims regarding his mailing privileges will be examined.[2]
 
 
 41
 The undisputed facts show that in March 1994 and again in May 1994, the warden sent the Plaintiff a memo advising him of his abuse of the mailing privileges, with the result that certain restrictions were imposed on him. The record shows several instances when Plaintiff sent "legal" mail when clearly the mail did not fall within the definition of privileged legal mail under DOC regulations. For example, the Plaintiff has written several letters to different attorneys soliciting representation for his legal problems, which he mailed as privileged legal mail, when this type of letter does not qualify as such under DOC regulations.[3] Plaintiff also sent mail to the DOC's general counsel marked as legal mail, although again this mail did not qualify as such under the DOC regulations. The general counsel wrote to the warden complaining of this action. Further, the Plaintiff has sent letters to various companies and individuals when those companies and persons have requested that the correspondence cease. In addition to all of the above, the warden noted that the Plaintiff was corresponding with various persons, soliciting those persons to continue his business operations when this is not allowed under DOC regulations. Accordingly, Plaintiff's mail was to be screened by his unit manager and by the law librarian for a period of 90 days in order to ensure Plaintiff's compliance with the regulations. This restriction on Plaintiff's mailing privileges appears reasonable in light of his repeated violations of the mailing policy and it seems consistent with the DOC regulations.
 
 
 42
 The Plaintiff also complains of being prohibited from corresponding with his wife who is an inmate in another DOC facility. However, the undisputed facts show that the wife obtained a divorce from the Plaintiff and thus, they are no longer legally married. Plaintiff makes an outrageous argument that his religion does not recognize this divorce and thus he should be allowed to correspond with her. However, the fact remains that they are divorced under Oklahoma law and as both of them are inmates within a DOC facility, they can only correspond with each other with the warden's permission.
 
 
 43
 The Plaintiff also complains of being denied a publication entitled "White Aryan Resistance," which he maintains he needs for his "legal research." The special report contains the warden's responses to two separate prison grievances submitted by the Plaintiff over being denied this publication. On November 5, 1993 and again on March 23, 1994, the warden explained to the Plaintiff that he was denied the publication because it advocates racial, religious or national hatred, which is prohibited by the DOC regulations. See Attachment H and J to Special Report. The warden advised the Plaintiff that if in fact he needed some information from that publication for a lawsuit, he could specifically advise what information he needed and his request would be considered. Plaintiff did not respond to that offer. From previous prisoner lawsuits filed in this Court as well as from some of the Plaintiff's own pleadings in this case, it is clear that the prison facility is dealing with race-related issues that are probably magnified greatly over problems existing in our open society. Certainly, the prison administrators have a legitimate interest in attempting to control potential race problems and they certainly have a legitimate interest in prohibiting inmates from receiving publications that increase the tension between the races. Plaintiff's rights have not been violated by denying him the racist publication he seeks.
 
 
 44
 Finally, the Plaintiff conclusively contends that the prohibition or regulation of his mail interferes with his right to freedom of religion. However, he fails to assert facts or to further explain why or how his religious rights are infringed by the mail restrictions. Mere conclusory allegations with no supporting factual averments are insufficient to state a constitutional claim. Sooner Products Company v. McBride, 708 F.2d 510 (10th Cir. 1983).[4] Even if the Plaintiff alleges that the regulation prohibits him from corresponding with his church or fellow members, which it does not, he still has made absolutely no allegation that he has been completely foreclosed from exercising his religion.
 
 III. VIOLATION OF BATTLE ORDERS
 
 45
 In the case of Battle v. Anderson, Case No. 72-95 (E.D. Okla.), the Court found that the Oklahoma prison system had serious constitutional concerns in the early to mid-1970's. Thus, the Court exercised supervisory control over the prison system as state officials sought to remedy the problems which the Court had found. While much of the case has been dismissed, the Court has continued to exercise supervisory control over the Oklahoma prison system.[5] As can be imagined, the Battle case contains numerous orders and directives, some of which have been superseded by other orders, by other case law, or by actions of the state. Plaintiff does not specifically contend which Battle order or directive he maintains has been violated.
 
 
 46
 In addition to his general allegations that there have been numerous violations of the Battle orders, the Plaintiff has filed pleadings within this case in which he has requested that mandamus issue to enforce a Battle compliance memorandum. This memorandum was issued several years ago and is at least partially outdated. In support of his request, the Plaintiff relies on McNeil v. Guthrie, 945 F.2d 1163 (10th Cir. 1991). In McNeil, the inmate was trying to file pleadings in the Battle case which the court clerk returned stating that the case was closed and that the inmate needed to contact class counsel. The inmate then sought mandamus relief in the Tenth Circuit to require the court clerk to file the pleadings. The court clerk was ordered to file the pleadings. In this case, the Plaintiff is not seeking to file pleadings but to enforce a compliance memorandum which may or may not be applicable to his case.
 
 
 47
 In order to be entitled to mandamus relief, a petitioner must show a clear abuse of discretion or conduct which arbitrarily assumes and exercises authority contrary to that of the judiciary. (quoting Mallard v. United States District Court, 490 U.S. 296, 309, 109 S.Ct. 1814, 1822, 104 L.Ed. 2d 318 (1989)).
 
 
 48
 McNeil, 945 F.2d at 1165. The party seeking relief must also establish that he has no other means other than the writ of mandamus to obtain this relief. Mallard, 490 U.S. at 309. The Plaintiff has made no such showing. Further, any effort to enforce the Battle orders and directives should be brought in that Court, as that Court is most familiar with its own orders and directives and whether they are still in effect.
 
 IV. RETALIATORY ACTIONS
 
 49
 Plaintiff next argues that the Defendants have a history of threatening retaliatory action, including threatening to transfer prisoners to other prison facilities. It is settled law that state officials may not retaliate against an inmate because of the inmate's exercise of his right of access to the courts. Green v. Johnson, 977 F.2d 1383, 1389 (10th Cir. 1992); Smith v. Maschner, 899 F.2d at 947. Retaliation requires evidence of improper motive to survive a summary judgment motion. Anderson v. Liberty Lobby, 477 U.S. at 256-257; Smith v. Maschner, 899 F.2d at 948 n. 4. In Smith, the Tenth Circuit Court of Appeals found circumstantial evidence sufficient to create a jury question of retaliation where the inmate demonstrates "suspicious timing" of disciplinary action, "coincidental transfers," and an "alleged pattern of blocking access to legal materials and assistance." Smith v. Maschner, 899 F.2d at 949. The issue before this Court then, is whether there is direct or circumstantial evidence from which a reasonable jury could find that "the actual motivating factor behind defendants' action was retaliation for [plaintiff's] prior or current litigation." Green v. Johnson, 977 F.2d at 1390-1391; Smith v. Maschner, 899 F.2d at 949. (emphasis added).
 
 
 50
 Plaintiff first contends that he suffered retaliation by the threat of transfer. However, the "facts" that he alleges to support this claim clearly refute his own contentions. First, in his affidavit that is attached to his complaint, Plaintiff states that there have been "implied" threats of transfer. In his "motion to supplement record" filed July 26, 1994 [Docket No. 25], he also talks of "implied" threats of retaliation which could "possibly" cause his transfer. Later, in a pleading styled "Plea for Judicial Notice of Developments" [Docket No. 38], he contends that the DOC has a policy to require inmates like him who are serving life sentences to be incarcerated in a maximum security facility.[6] Plaintiff believes this policy was implemented solely to disguise his potential retaliatory transfer. Finally, in a pleading filed November 16, 1994 [Docket No. 84], Plaintiff claims that he heard that several prisoners including himself would be transferred. Contrasted against the Plaintiff's conclusory and speculatory allegations, the following facts are shown by the Special Report that have not been refuted. Plaintiff requested to be transferred to another prison facility to be closer to his mother. That request was denied as it was explained to the Plaintiff that the facility to which he wanted a transfer was a minimum security facility and thus, he was not eligible as he is classified as medium security. However, in order to attempt to accommodate his wishes, DOC officials suggested another facility that was closer to his mother that was a medium security facility. See Attachment T to Special Report. The Plaintiff refused that transfer. The Defendants deny that any threats have been made to transfer the Plaintiff and during the approximate eight months this lawsuit has been on file, he has not been transferred.
 
 
 51
 Moreover, even if the DOC does in fact intend to transfer the Plaintiff to a different facility, Plaintiff still fails to show that the proposed action is being taken for retaliatory reasons. Through other prisoner lawsuits filed in this Court, the undersigned is aware that the DOC is facing overcrowded conditions throughout its prisons, but particularly in its medium security facilities. Thus, if the DOC does implement a policy to transfer prisoners with life sentences to maximum security facilities in over to alleviate the overcrowding in its medium security facilities, that action seems reasonable and within their discretion. The problems and risks with transferring medium security classification inmates to minimum security facilities are readily apparent and have been the subject of recent media attention.
 
 
 52
 The law is clear that the due process clause does not entitle a prisoner to any particular security classification nor does it protect an inmate from being transferred from one institution to another.[7] Olim v. Wakinekona, 461 U.S. 238, 245-46 (1983); Hewitt v. Helms, 459 U.S. 460, 468 (1983); Montanye v. Haymes, 427 U.S. 236 (1976); Meachum v. Fano, 427 U.S. 215, 224-25 (1976); Twyman v. Crisp, 584 F.2d 352 (10th Cir. 1978) (Department of Corrections' regulation and Oklahoma law regarding intra-state prison transfers and change of security status make such decisions discretionary within general guidelines, and no due process rights exist which give rise to a right to judicial review); Bailey v. Shillinger, 828 F.2d 651, 652 (10th Cir. 1987) (reclassification of plaintiff into administrative segregation does not involve deprivation of liberty interest protected by due process clause). Furthermore, the due process clause does not require hearings in connection with inmate transfers and regressive reclassification, unless the inmate has a "justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events." Montanye v. Haymes, 427 U.S. at 242; Meachum v. Fano, supra; Frazier v. Dubois, 922 F.2d 560 (10th Cir. 1990). Moreover, any losses in privileges and programs resulting from a reclassification or transfer decision are not constitutionally protected liberty or property interests. See Ingram v. Papalia, supra; Twyman v. Crisp, supra. The internal supervision of correctional institutions lies with the prison administrators and is ordinarily not subject to judicial review. Hewitt v. Helms, 459 U.S. at 467; Marchesani v. McCune, 531 F.2d 459, 462 (10th Cir. 1976), cert. denied, 429 U.S. 846 (1976). The Plaintiff has not been transferred at all, let alone for retaliatory reasons.
 
 
 53
 Next, Plaintiff complains that he lost his job as an inmate research assistant due to retaliation. Under DOC regulations, inmate research assistants must receive training on at least a semi-annual basis and then pass a test to be allowed to continue in the position. See OP-030115, effective December 19, 1993, p. 12, Attachment B to Special Report. This regulation further provides that an inmate research assistant who fails any training session will immediately be terminated from his assignment, but he will be allowed to attend the next training session and retest. If he successfully passes the retest, he will be assigned back to the position as a research assistant. The undisputed facts show that Plaintiff was terminated from his position as a research assistant on June 30, 1994 due to his failure to pass the semi-annual test.[8] Absent any retaliatory motive, Plaintiff has no protected interest in holding any particular prison job. Ingram v. Papalia, 804 F.2d 595, 596 (10th Cir. 1986); Altizer v. Paderick, 569 F.2d 812, 813 (4th Cir. 1978), cert. denied, 435 U.S. 1009 (1978); Coyle v. Hughs, 436 F.Supp. 591 (W.D. Okla. 1977).
 
 V. CONDITIONS OF CONFINEMENT
 
 54
 Next, the Plaintiff generally complains about the conditions of his confinement as being in violation of his Eighth Amendment rights. To sustain a claim under the Eighth Amendment, Plaintiff must show a deliberate indifference to his safety. Berry v. City of Muskogee, Okla., 900 F.2d 1489, 1498 (10th Cir. 1990). The Plaintiff does not state in particular detail of what conditions he complains nor does he even contend that he has been injured by these conditions. Rather, he seems concerned about the possibility of injury, and he believes that his incarceration has made him more susceptible to TB and sexually transmitted diseases. The special report contains an affidavit from JoAnn Sheppard, the Health Services Administrator for the facility in which the Plaintiff is incarcerated. She states that the Plaintiff is no more at "risk than anyone on the street. Anyone who breathes has some risk for TB as it is an airborne disease. He would have to be practicing at risk behavior [i.e. unprotected sex or sharing drug rigs] to be at risk for HIV or Hepatitis B." Ms. Sheppard adds that Plaintiff is a healthy individual with no medical problems.
 
 
 55
 It must also be kept in mind that harsh conditions are not unconstitutional unless said conditions can be said to be cruel and unusual under contemporary standards. Although prison inmates may not be deprived of the minimal civilized measures of life's necessities,
 
 
 56
 conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.
 
 
 57
 Rhodes v. Chapman, 452 U.S. 337, 347 (1981).
 
 
 58
 As one court has noted, the Plaintiff would do well to remember that he is incarcerated in a state correctional facility, "not a restaurant, a haberdashery or a health spa. Therefore, the admittedly uncomfortable conditions nebulously outlined *** do not, by themselves, articulate a situation that could be fairly characterized as cruel and unusual punishment." Veteto v. Miller, 829 F.Supp. 1486, 1496 (M.D. Pa. 1992). The Constitution clearly does not mandate comfortable prisons. Rhodes, supra.
 
 
 59
 In Wilson v. Seiter, 501 U.S. 294 (1991), the Court once again pointed out that there are two components to an Eighth Amendment claim. First, the objective component; was there a sufficiently serious deprivation and second, the subjective component; did the officials have a sufficiently culpable state of mind. Although the undersigned does not find a sufficiently serious deprivation, it is undeniable that the Oklahoma prison system has some overcrowding problems. However, it is the acknowledgement of these problems and the accompanying efforts to correct them that demonstrates the lack of a culpable state of mind on the part of the state officials. Moreover, overcrowding alone shall not form the basis of an Eighth Amendment claim pursuant to recent legislation in the new crime bill. "A federal court shall not hold prison or jail overcrowding unconstitutional under the Eighth Amendment except to the extent that an individual plaintiff inmate proves that the crowding causes the infliction of cruel and unusual punishment of that inmate. 18 U.S.C. Sec.3626(a)(1).
 
 VI. ACCESS TO THE COURTS
 
 60
 Plaintiff next alleges that he is being denied access to the courts. He contends that the size of the prison law library and the amount of time he is able to spend there have been reduced. He also contends that prison officials' actions in requiring him to pay for photocopying and postage have resulted in his denial of access to the courts. The undersigned finds it difficult to understand the Plaintiff's complaint about his lack of access to the courts, as he has filed several different actions in this Court and has literally flooded this Court with pleadings in the instant case. In fact, ninety-three separate pleadings have been filed in this case alone, most of which have been filed by the Plaintiff. He has certainly managed to present all of his complaints in this action, without restriction from prison officials. Plaintiff must also keep in mind that while he does have a right to meaningful access to the courts, Bounds v. Smith, 430 U.S. 817 (1977), that right is limited to "reasonable" access and is not unlimited or immediate access. See Ramos v. Lamm, 639 F.2d 559, 583 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981).
 
 
 61
 As to the Plaintiff's complaints about the size of the library, the facts show that the prison law library was co-located with the general library. However, when funds were received to build a new general library, the law library was eventually moved to a smaller facility that was of sufficient size to hold its materials. There are no allegations or facts to show that the amount of legal materials available to the Plaintiff have been reduced, and the fact that the law library has been moved to a smaller facility does not deny Plaintiff access to the courts.
 
 
 62
 Plaintiff also complains that his access to the law library is restricted because he has to make use of his canteen and laundry privileges during the same hours that the library is open. The scheduling problem of which Plaintiff complains is not unlike the problems faced on a day-to-day basis by individuals who are not incarcerated. He, like everyone else, must efficiently manage his time, and assign priorities on how that time will be used. These allegations do not establish any denial of access to the courts.[9] More importantly, the Plaintiff has failed to show any prejudice from whatever delay or denial he has suffered. Since prejudice is an essential element for maintaining a claim for denial of access to the courts, Twyman v. Crisp, supra, Plaintiff's claim for denial of access to the courts must fail. Moreover, prison records show that from July 1, 1994 through September 6, 1994, an approximate two-month period, Plaintiff signed into the law library on 46 separate occasions and used that facility for a total of 96.25 hours. It is clear that his right of access to the courts has not been denied by the size of the prison law library or the number of hours to which he has access to it.
 
 
 63
 Lastly, Plaintiff contends that his access to the courts has been denied as he does not receive free photocopying and postage. Under DOC regulations, a non-indigent inmate is charged five cents per copy and must pay his own postage. See OP030115-0 dated December 19, 1993, Attachment B to Special Report. However, if an inmate is considered indigent, the DOC provides free photocopying and postage. An inmate is considered indigent if his trust fund draw account shows total receipts of or a balance of less than $15.00 from the first day through the last day of the preceding month. Inmates who are considered non-indigent, but who do not have a sufficient balance in their account at that time to pay for photocopying and postage, are provided with the service, with the expense being collected by the DOC when funds become available to the inmate. This regulation is obviously designed to ensure that inmates are not denied their access to the courts, while at the same time, holding them responsible for a portion of the photocopying and postage expense, when the inmate has the resources to pay. Again, as evidenced by the Plaintiff's numerous pleadings within this case alone, he has not been denied access to the courts by a lack of photocopying and postage. Additionally, the constitutional concept of an inmate's right of access to the courts does not require prison officials to provide the inmate with free or unlimited access to a photocopying machine, Harrell v. Keohane, 621 F.2d 1059, 1061 (10th Cir. 1980), nor does it require unlimited free postage. Twyman v. Crisp, supra.
 
 VII. TREATMENT OF LIFE SENTENCES
 
 64
 As his final claim, Plaintiff contends that he is entitled to have his life sentences treated as a 45-year sentence under Oklahoma law, with appropriate credits applied thereto, further reducing his sentence. He also contends that by so treating his sentences, he will be entitled to a new parole consideration date. Plaintiff's contentions about the treatment of his life sentences and about his parole consideration date raise no issues of constitutional concern. As long as the sentence is within the range of punishment provided by state law, sentencing issues are questions of state law that do not raise constitutional concerns. Handley v. Page, 279 F.Supp. 878 (W.D. Okla. 1968); Haynes v. Butler, 825 F.2d 921 (5th Cir. 1987), cert. denied, 484 U.S. 1014 (1988). Furthermore, the Oklahoma statutes governing parole do not establish a liberty interest, protected by specific due process procedures. Shirley v. Chestnut, 603 F.2d 805, 807 (10th Cir. 1979). Parole is a privilege and there is no constitutional or inherent right to parole. Lustgarden v. Gunter, 966 F.2d 552 (10th Cir. 1992), cert. denied, 113 S.Ct. 624 (1992).
 
 
 65
 Moreover, the case Plaintiff cites in support of his argument, Collins v. State, CIV-93-2273-R (W.D. Okla.), does not begin to stand for the broad proposition that the Plaintiff contends. Mr. Collins was sentenced to death in the 1970's. At the time of his crime and sentence, the effective credit statute did not prohibit an individual sentenced to life from receiving "good time" credits. In 1976, the credit statute was amended to, among other things, prohibit an individual sentenced to life from receiving such credits. In 1977, Mr. Collins' sentence was changed from the death penalty to life imprisonment. As the credit statute was amended in 1976 to prohibit an inmate sentenced to life imprisonment from receiving such credits, he was denied the credits.
 
 
 66
 In his action before this Court, Mr. Collins argued that he was entitled to the most favorable credit statute beginning with the one in effect at the time of his crime. He argued that applying the less favorable credit statute was ex post facto as to him. In the initial report and recommendation of the magistrate judge, it was found that Mr. Collins was entitled to the most favorable credit statute. Thus, the magistrate judge recommended that credits and time remaining to serve be figured under different credit statutes to determine the most favorable. The district judge adopted this recommendation. Because a life sentence is not a time certain and credits cannot effectively be deducted from a life sentence, it was determined for credit purposes that a life sentence would be equivalent to 45 years, which is the number used by the Pardon and Parole Board in figuring time for parole consideration for life sentences or sentences longer than 45 years. After making the determination as directed, the state filed a supplemental brief explaining in more detail why Mr. Collins was not entitled to the credits. In a supplemental recommendation, the magistrate judge found that Mr. Collins was not entitled to have his sentence considered as 45 years nor was he entitled to credits. Mr. Collins filed an objection to the supplemental recommendation, and the case is awaiting a final order from Judge Russell.
 
 
 67
 The Plaintiff, in this case, was incarcerated in 1992. The credit statute applicable to him, 57 Okla. Stat. Sec.138, states that inmates sentenced to life are not entitled to credits. The Plaintiff was never subject to any different provision and thus, he does not have the ex post facto argument relied on by Mr. Collins. Furthermore, there is absolutely no reason and no authority in support of the Plaintiff's proposition that a life sentence is equivalent to a 45-year term sentence.
 
 VIII. MISCELLANEOUS REQUESTS
 
 68
 Plaintiff also asks whether he is entitled to statutory rights under 18 U.S.C. Sec.242 or 42 U.S.C. Sec.1985. Title 18, Sec.242 of the United States Code allows for criminal sanctions against an individual violating another individual's civil rights. There is no private right of action under that statute. Robinson v. Overseas Military Sales Corp., 21 F.3d 502 (2d Cir. 1994). United States Code, tit. 42, Sec.1985 pertains to various conspiracies to violate an individual's civil rights. There are absolutely no facts alleged by the Plaintiff to support any type of a conspiracy claim. When a plaintiff fails to plead facts supporting vague claims of a broad conspiracy, the Court need not conjure up unpleaded facts to support the conclusory suggestions of conspiracy. Slotnick v. Staviskey, 560 F.2d 31, 33 (1st Cir. 1977), cert. denied, 434 U.S. 1077 (1978).
 
 
 69
 Plaintiff has also asked for class action certification. [Docket Nos. 29 and 63]. A prerequisite for class action certification is a finding by the Court that the representative party or parties can "fairly and adequately protect the interest of the class." Rule 23(a)(4), Fed. R. Civ. P. Some of the factors courts look to in determining the adequacy of representation are the qualifications and experience of the person or persons actually conducting the litigation. Because a layman does not ordinarily possess the legal training and expertise necessary to protect the interests of a proposed class, courts are reluctant to certify a class represented by a pro se litigant. See 7A Wright Miller and Kane, Federal Practice and Procedure, Sec.1769.1 n. 12. See also, Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir. 1975) (pro see prisoners are not adequate representatives fairly able to represent the class); Ethnic Awareness Organization v. Gagnon, 568 F.Supp. 1186, 1187 (E.D. Wis. 1983). Accordingly, the undersigned concludes that the Plaintiff is not an adequate class representative and his motions for class certification should be denied.
 
 
 70
 Further, due to the recommended disposition of this matter, Plaintiff's request for injuctive relief [Docket Nos. 4, 19, 21, 22, 23, 28, 33, 34, 41, 42, 75, 84, 87, 91 and 93], his motions to compel discovery and other discovery motions [Dockets Nos. 5, 32, 56, 62, 67, 89 and 90], his proposed settlement offer [Docket No. 6], his request for appointment of counsel [Docket No. 21], his motion to strike [Docket No. 31], his motions for default judgment [Docket Nos. 39, 49, 50, 69, 70 and 80], his motions for summary judgment [Docket Nos. 51, 57, 58, 72 and 83], his motion to allow testimony [Docket No. 64], and his motion to have the Clerk serve the Defendants with copies of pleadings [Docket No. 81] should all be denied.
 
 RECOMMENDATION
 
 71
 Based upon the foregoing, it is recommended that the Court exercise its discretion and decline to hear the Plaintiff's action for declaratory judgment. Further, to the extent that the Plaintiff proceeds under 42 U.S.C. Sec.1983, it is recommended that the Defendants' motion for summary judgment be granted. The Plaintiff is advised of his right to object to this Report and Recommendation by February 28th, 1995, in accordance with 28 U.S.C. Sec.636 and Local Court Rule 39. Plaintiff is further advised that failure to make timely objection to this Report and Recommendation waives his right to appellate review of both factual and legal questions. Moore v. United States of America, 950 F.2d 656 (10th Cir. 1991). This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.
 
 
 72
 ENTERED this 13th day of February 1995.
 
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [1]
 As mentioned above, Plaintiff attempts to include new issues in his numerous pleadings filed subsequent to his complaint and amended complaint, without first seeking leave of Court. An example of some of these new claims that Plaintiff has attempted to raise in his subsequent pleadings are 1) that his equal protection rights have been violated due to the differences in treatment for black inmates as opposed to white inmates; 2) that inmates are a suspect classification due to treatment by the State; 3) that prison officials are misappropriating funds and are thus subject to criminal prosecution; and 4) that he wants an order from this Court allowing him to give his heart for purposes of transplant to his ailing mother. U.S. District Judge Ralph Thompson has already dealt with this last issue by an order dated July 5, 1994. [See Docket No. 20]. These items are cited as merely examples of problems that the undersigned has faced in trying to orderly consider and resolve the Plaintiff's claims
 
 
 [2]
 In two unpublished cases, the Tenth Circuit has found the D.O.C. regulations for mail to be constitutional. Shabazz v. Johnson, 13 F.3d 406, text available on Westlaw, 1993 WL 498170 (10th Cir. 1993) (upholding the regulation on limited censorship of incoming publication); Lo yd v. Higgins, 986 F.2d 1427, text available on Westlaw, 1993 WL 53116 (10th Cir. 1993) (reviewing the policy on prisoner mail). These cases are cited for persuasive value only under Tenth Circuit General Order of November 29, 1993, suspending Tenth Circuit Rule 36.3
 
 
 [3]
 The letters soliciting attorney representation do not contain any facts concerning the potential representation, such as to invoke the attorney/client privilege
 
 
 [4]
 The Plaintiff's request for declaratory relief under the Religious Freedom Restoration Act of 1993 must fail for the same reason. All allegations must be accompanied by supporting facts
 
 
 [5]
 On November 17, 1994, the district court entered an order which terminated its supervisory jurisdiction over the Oklahoma prison system except for the issue of racial segregation which is still pending. That order is presently on appeal to the Tenth Circuit Court of Appeals
 
 
 [6]
 Plaintiff is serving four consecutive life sentences from the District Court of Creek County, Oklahoma. SeeSpecial Report
 
 
 [7]
 Therefore, the Plaintiff has no right to decide or suggest what should be considered with regard to his security classification. In one of his pleadings, the Plaintiff asks this Court to decide whether he is entitled to a security classification based upon the criminal action of which he was convicted rather than allowing the DOC to consider his past incarceration record and the amount of time left to serve on his current sentences. Numerous things are considered in a security classification decision, including the amount of time to which the prisoner was sentenced. Because the Plaintiff has no liberty interest in a particular security classification, he has no right to question any truthful information that is considered in reaching that decision
 
 
 [8]
 In his "Motion to Strike Response of Defendants" filed August 4, 1994 [Docket No. 31], Plaintiff contends that he could not have failed the test as he had the same answers as nine other inmates who passed the test. Plaintiff does not explain how he knows that his answers were exactly the same as the other inmates. Moreover, in his later pleadings and documents provided to this Court, Plaintiff appears to concede the fact that he failed the test
 
 
 [9]
 Plaintiff argues that there are not enough trained inmate law clerks. However, this cannot apply to him, as he in fact was an inmate law clerk. Although Plaintiff lost his job as a law clerk, he still continues to help his fellow inmates on legal problems on a volunteer basis